J. T. ATKINSON *et al.* v. H. P. WOODMANSEE.

No. 13,331. (74 Pac. 640.)

SYLLABUS BY THE COURT.

1. CONSTITUTIONAL LAW — *Mechanics' Lien Act — Amendment Provision Valid.* Section 5121, General Statutes of 1901, being section 5 of the mechanics' lien law, and providing as follows: "In case of action brought, any lien statement may be amended by leave of court in furtherance of justice as pleadings may be in any matter, except as to the amount claimed," permits an amendment correcting the description of the property and the name of the owner, and does not thereby authorize the taking of property without due process of law.

2. ———— *Provision for Attorney's Fee Unconstitutional.* Section 5125, General Statutes of 1901, being section 9 of the mechanics' lien law, and providing as follows: "In any action brought by any artisan or day-laborer to enforce any lien under this act, where judgment be rendered for plaintiff, the plaintiff shall be entitled to recover a reasonable attorney's fee to be fixed by the court, which shall be taxed as costs in the action," denies to persons within the jurisdiction of this state the equal protection of the laws, and is, therefore, unconstitutional and void.

Error from Wyandotte district court; E. L. FISCHER, judge. Opinion filed December 12, 1903. Modified and affirmed.

*Joseph Johnson*, and *J. A. Smith*, for plaintiffs in error.

*Alden & McFadden*, and *S. H. Whisner*, for defendant in error.

The opinion of the court was delivered by

BURCH, J.: In an action for the foreclosure of a mechanic's lien it was discovered that the land upon which the improvement had been erected had been misdescribed, and that the owner had been misnamed in the original lien statement. The district court permitted amendments to cure these, defects, and rendered judgment foreclosing the lien. This action of the court is complained of. It was, however, fully warranted by section 5121, General Statutes of 1901, which provides as follows:

"In case of action brought, any lien statement may be amended by leave of the court in furtherance of justice as pleadings may be in any matter, except as to the amount claimed."

The legislature could, without doubt, provide for the enforcement of a lien statement amended as to parties and as to property to the same extent that it could provide for the appropriation of the property by virtue of a lien in the first instance.

The judgment rendered, however, included an attorney's fee of twenty-five dollars, allowed upon due proof under section 5125, General Statutes of 1901, which reads as follows:

"In any action brought by any artisan or day-laborer to enforce any lien under this act, where judgment be rendered for plaintiff, the plaintiff shall be entitled to recover a reasonable attorney's fee to be fixed by the court, which shall be taxed as costs in the action."

The constitution of the United States is the supreme law of the land, and the judges in every state are bound thereby, anything in the constitution or laws of their own state to the contrary notwithstanding. (U. S. Const., art. VI.) Section 1 of article XIV of the amendments to that constitution provides that no state shall deny to any person within its jurisdiction the equal protection of the laws. The statute in question singles out property-owners who are charged with receiving from artisans or day-laborers labor going to the improvement of their property, by virtue of a contract made by themselves or through contractors employed by them, and mulcts them in damages if they should be unsuccessful in resisting a claimed lien therefor. Under the statute such persons are subjected to a liability for attorney's fees when owners of other classes of property and when other classes of persons employing artisans and day-laborers are not subjected to such burden, and their contracts for labor are segregated from all other contracts and separately classified as if they possessed some distinctive attribute calling for the imposition of special legislative penalties for their enforcement.

Of course, the legislature may classify objects of legislation and it has a wide discretion in that respect, but classifications may not be made either arbitrarily or capriciously. There must be differences in the elements and relations distinguished producing consequences justifying difference in treatment, and these differences must be such as by the very nature of the things considered to divide them into classes. Thus, a statute allowing the recovery of attorney's fees in an action against a railroad company for damages caused by its negligence in permitting the escape of fire is in the nature of a police regulation to prevent careless-

ness in the use of a dangerous element, and the consequent destruction of property. (*Railroad Co. v. Matthews*, 58 Kan. 447, 49 Pac. 602, aff. 174 U. S. 96, 19 Sup. Ct. 609, 43 L. Ed. 909.) The business of fire insurance has likewise assumed such a peculiar and special relation to the public welfare that the legislature is authorized to provide special penalties for breaches of contracts made in its prosecution. (*Assurance Co. v. Bradford*, 60 Kan. 82, 55 Pac. 335; *Fid. Mut. Life Ass'n v. Mettler*, 185 U. S. 308, 22 Sup. Ct. 662, 46 L. Ed. 922.)

But the homely and highly beneficial act of building or repairing some structure upon his premises, or otherwise. improving them, by any man, whether rich or poor, who possesses property, whether much or little, does not so stand out from his other ordinary and innocent employments, or so stand out from similar employments of other men, as naturally to distinguish it from them. There is absolutely nothing to indicate that such a person, or a contract for such a purpose, should be the subject of impositions not suffered by others. The duty to pay is not more vital to the welfare of the public in this case than it is between other persons and with respect to other obligations. The legislature could not have believed that claims of the character adverted to by this act were unconscionably resisted beyond all other debts, and no other legal reason is discoverable for such a hostile and discriminating law.

Under the constitution of the state of Kansas, artisan and owner, contractor and laborer, are each one possessed of equal and inalienable rights to life, liberty, and the pursuit of happiness. They all live under the same indiscriminating sunshine, breathe the same free air, venerate the same historical past,

are imbued with the same patriotic ideals and look forward to equal shares in the common blessings of a higher civilization in a brighter future.   The burden of the law upon them should be as equal and impartial as the law of gravitation, and yet, in the baldest and most arbitrary manner imaginable, this act

"singles out a certain class of debtors and punishes them when for like delinquencies it punishes no others. They are not treated as other debtors, or equally with other debtors.  They cannot appeal to the courts as other litigants under like conditions and with like protection.  If litigation terminates adversely to them, they are mulcted in the attorney's fees of the successful plaintiff; if it terminates in their favor, they recover no attorney's fees.  It is no sufficient answer to say that they are punished only when adjudged to be in the wrong.  They do not enter the courts upon equal terms.  They must pay attorney's fees if wrong; they do not recover any if right; while their adversaries recover if right and pay nothing if wrong.  In the suits, therefore, to which they are parties they are discriminated against and are not treated as others. They do not stand equal before the law.  They do not receive its equal protection."  ( *Gulf, Colorado & Santa Fe R'y. v. Ellis*, 165 U. S. 150, 153, 17 Sup. Ct. 255, 41 L. Ed. 666.)

There is, therefore, a perfectly manifest and utterly irreconcilable conflict between the statute and the constitution.   The constitution is the direct mandate of the people themselves.   The statute is an expression of the will of the legislature.   Which shall this court obey ?

In the first case in the first volume of the reports of decisions made by this court it was assumed that a statute which clearly and beyond any substantial doubt infringes the supreme law should be declared unconstitutional.   The power to do so has since been exercised many times.   There is no lawful or consci-

entious escape from its exercise in this case, and the statute in question is declared to be unconstitutional and no warrant for the taxing of an attorney's fee as a part of the costs in the court below.

In a dissenting opinion in the case of *In re Davis*, 58 Kan. 368, 384, 49 Pac. 160, the writer discovered the following statement :

"It is now too late, for any effective purpose, to deny the right of the courts to sit in judgment upon acts of the legislature. Accumulated precedent has established such right beyond the questioning of one judge or even of many judges. If, however, it were an open inquiry, I should have no hesitation in denying the existence of the jurisdiction assumed."

This language refers to the right and power of courts to adjudge statutes conflicting with the fundamental law to be unconstitutional, since that is the only right to sit in judgment upon the acts of the legislature which has been established, and the only power or jurisdiction which courts assume to have over acts of the legislature aside from the ordinary and unquestioned matter of interpretation.

Following the announcement quoted is this remarkable statement :

"No close student of the structure, history and philosophy of the government but will agree that the exercise of such power was not within the design of the framers of either state or federal constitution. The question whether such power should be conferred by express provision was debated in the constitutional convention of 1787. Propositions to confer it were repeatedly brought forward and as often put aside without decision. Finally, the one introduced by Mr. Madison was put to a vote, and received the approval of Delaware, Maryland and Virginia only ; Mr. Dickinson, during the course of the debate, epitomizing the objection to the scheme in the pithy observation that

'the justiciary of Aragon became by degrees the law-giver.' It never thereafter, during the sessions of the convention, became a subject of discussion." (Bancroft's History of the Constitution, vol. 2, ch. 10.)"

Against the extravagance of this language may be opposed a statement somewhat rhetorical in form, but still of one who has been accredited a close student of the structure, history and philosophy of government—Rufus Choate:

"I do not know that I can point to one achievement in American statesmanship which can take rank for its consequences of good above that single decision of the supreme court, which adjudged that an act of the legislature contrary to the constitution is void, and that the judicial department is clothed with the power to ascertain the repugnancy, and pronounce the legal conclusion. That the framers of the constitution intended this to be so is certain ; but to have asserted it against Congress and the executive, to have vindicated it by that easy yet adamantine demonstration than which the reasonings of mathematics show nothing surer, to have inscribed this vast truth of conservatism upon the public mind, so that no demagogue, not in the last stage of intoxication, denies it—this is an achievement of statesmanship (of the judiciary) of which a thousand years may not exhaust or reveal all the good." (Harvard Law School Address, July, 1845.)

Propositions to confer in express words the simple power to declare statutes unconstitutional were not put aside in the federal convention. The proposition of Madison, debated by Dickinson and defeated upon receiving the approval of Delaware, Maryland and Virginia only, was not such a proposition, and Bancroft does not so state. Bancroft's text is as follows:

"A deeply seated dread of danger from hasty legislation pervaded the mind of the convention ; and Mason, Madison and others persistently desired to vest

in the supreme court a revisionary power over the acts of Congress, with an independent negative, or a negative in conjunction with the executive." (2 Bancroft's Hist. Const., ch. 10, p. 195.)

Madison's motion was:

"All acts before they become laws should be submitted both to the executive and supreme judiciary departments, that if either of these should object, two-thirds of each house, if both should object, three-fourths of each house, should be necessary to overrule the objections and give to the acts the force of law." (3 Doc. Hist. Const. 536.)

This proposition, as all others which had preceded it, allowed the judges to pass upon the wisdom, policy and expediency of legislative acts, and involved them in politics, parties, and all the business and circumstance of legislation. That proposition was debated and defeated. In the course of the debate upon that question Dickinson made the statement quoted, because impressed with a remark of Mercer that the judiciary ought to be separate from the legislature and that he disapproved the doctrine that the judges as expositors of the constitution should have the authority to declare a law void. (3 Doc. Hist. Const. 537, 538.) Gouverneur Morris replied to Dickinson that he could not agree that the judiciary should be bound to say that a direct violation of the constitution was law. (3 Doc. Hist. Const. 538.) And the proceedings of the constitutional convention and of the state conventions held to consider its adoption may be searched in vain for any expression of dissent from the view of Morris, except the two just referred to.

On the other hand, on June 4, when debating in the federal convention the subject of a council of revision, Elbridge Gerry

"doubts whether the judiciary ought to form a part

of it, as they will have a sufficient check against encroachments on their own department by their exposition of the laws, which involved a power of deciding on their constitutionality.   In some states the judges had actually set aside laws as being against the constitution.   This was done, too, with general approbation.   It was quite foreign from the nature of the office to make them judges of the policy of public measures."   (3 Doc. Hist. Const. 54.)

On July 17, when considering a proposition to give a congressional negation to state laws,

"Mr. Sherman thought it unnecessary, as the courts of the states would not consider as valid any law contravening the authority of the Union, and which the legislature would wish to be negatived." (3 Doc. Hist. Const. 351.)

And—

"Mr. Gouverneur Morris was more and more opposed to the negative.   .   .   .   A law that ought to be negatived will be set aside in the judiciary department and, if that security should fail, may be repealed by a national law."   (3 Doc. Hist. Const. 353.)

On July 21 James Wilson renewed the proposition to associate the judiciary with the executive in the revisionary power, saying :

"The judiciary ought to have an opportunity of remonstrating against projected encroachments on the people as well as on themselves.   It had been said that the judges, as expositors of the laws, would have an opportunity of defending their constitutional rights.   There was weight in this observation ; but this power of the judges did not go far enough.   Laws may be unjust, may be unwise, may be dangerous, may be destructive, and yet may not be so unconstitutional as to justify the judges in refusing to give them effect."   (3 Doc. Hist. Const. 390.)

On the same day Luther Martin

"considered the association of the judges with the

executive as a dangerous innovation, as well as one which could not produce the particular advantage expected from it. A knowledge of mankind and of legislative affairs cannot be presumed to belong in a higher degree to the judges than to the legislature. And as to the constitutionality of the laws, that point will come before the judges in their proper official character. In this character they have a negative on the laws. Join them with the executive in the revision and they will have a double negative." (3 Doc. Hist. Const. 395.)

And on that day George Mason observed that

"it had been said that if the judges were joined in this check on the laws they would have a double negative, since in their expository capacity of judges they would have one negative. He would reply that in this capacity they would impede in one case only the operation of laws. They could declare an unconstitutional law void. But with regard to every law, however unjust, oppressive or pernicious, which did not come plainly under this description, they would be under the necessity as judges to give it a free course. He wished the further use to be made of the judges, of giving aid in preventing every improper law." (3 Doc. Hist. Const. 396.)

In the convention of North Carolina, Richardson Davie, a delegate to the federal convention, said:

" Without a judiciary the injunctions of the constitution may be disobeyed, and the positive regulations neglected or contravened, . . . and the constitution might be violated with impunity, if there were no power in the general government to correct and counteract such laws. This great object can only be safely and completely obtained by the instrumentality of the federal judiciary." (4 Elliot's Debates, 156, 157.)

In the convention of Pennsylvania, James Wilson said:

"If a law should be made inconsistent with those powers vested by this instrument in Congress, the

judges. as a consequence of their independence, and the particular powers of government being defined, will declare such law to be null and void ; for the power of the constitution predominates.  Anything, therefore, that shall be enacted by Congress contrary thereto, will not have the force of law.'' ( 2 Elliot's Debates, 489.)

In the Virginia convention, Edmund Randolph said that if Congress wished to aggrandize themselves by oppressing the people, the judiciary must first be corrupted.  And Patrick Henry spoke as follows :

"The honorable gentlemen did our judiciary honor in saying that they had firmness to counteract the legislature in some cases.  Yes, sir ; our judges opposed the acts of the legislature.  We have this landmark to guide us. ' They had fortitude to declare that they were the judiciary, and would oppose unconstitutional acts.  Are you sure your federal judiciary will act thus ?  Is that judiciary as well constructed and as independent of the other branches as our state judiciary ?  Where are your landmarks in this government ?  I will be bold to say you cannot find any in it.  I take it as the highest encomium on this country that the acts of the legislature, if unconstitutional, are liable to be opposed by the judiciary.'' ( 3 Elliot's Debates, 324, 325.)

In this convention, fifteen years before the decision in *Marbury v. Madison*, 1 Cranch, 137, 2 L. Ed. 60, John Marshall spoke as follows :

"Has the government of the United States power to make laws on every subject ?  Does he understand it so ?  Can they make laws affecting the mode of transferring property, or contracts, or claims, between citizens of the same state ?  Can they go beyond the delegated powers ?  If they were to make a law not warranted by any of the powers enumerated, it would be considered by the judges as an infringement of the constitution which they are to guard.  They would

not consider such a law as coming under their juris-
diction. They would declare it void." (Magruder's
Life of John Marshall, 83.)

Alexander Hamilton has been esteemed to be some-
thing of a student of the structure and philosophy of
this government, and, as a member of the federal con-
vention, had some share in framing the constitution
of the United States. In order to induce the people
of the United States to adopt that constitution, he gave
to the world upon June 17 and 20, 1788, the paper con-
stituting No. 78 of The Federalist, in which the follow-
ing discussion of this subject occurs :

"The complete independence of the courts of jus-
tice is peculiarly essential in a limited constitution.
By a limited constitution, I understand one which
contains certain specified exceptions to the legislative
authority; such, for instance, as that it shall pass no
bills of attainder, no *ex post facto* laws, and the like.
Limitations of this kind can be preserved in practice
no other way than through the medium of the courts
of justice, whose duty it must be to declare all acts
contrary to the manifest tenor of the constitution
void. Without this, all the reservations of particular
rights or privileges would amount to nothing.

"Some perplexity respecting the right of the courts
to pronounce legislative acts void, because contrary
to the constitution, has arisen from an imagination
that the doctrine would imply a superiority of the ju-
diciary to the legislative power. It is urged that the
authority which can declare the acts of another void
must necessarily be superior to the one whose acts
may be declared void. As this doctrine is of great
importance in all the American constitutions, a brief
discussion of the grounds on which it rests cannot be
unacceptable.

"There is no position which depends on clearer
principles than that every act of a delegated author-
ity, contrary to the tenor of the commission under
which it is exercised, is void. No legislative act,

therefore, contrary to the constitution can be valid. To deny this, would be to affirm, that the deputy is greater than his principal; that the servant is above his master; that the representatives of the people are superior to the people themselves; that men, acting by virtue of powers, may do not only what their powers do not authorize, but what they forbid.

"If it be said that the legislative body are themselves the constitutional judges of their own powers, and that the construction they put upon them is conclusive upon the other departments, it may be answered, that this cannot be the natural presumption, where it is not to be collected from any particular provisions in the constitution. It is not otherwise to be supposed that the constitution could intend to enable the representatives of the people to substitute their will to that of their constituents. It is far more rational to suppose that the courts were designed to be an intermediate body between the people and the legislature, in order, among other things, to keep the latter within the limits assigned to their authority. The interpretation of the laws is the proper and peculiar province of the courts. A constitution is, in fact, and must be, regarded by the judges as a fundamental law. It must therefore belong to them to ascertain its meaning, as well as the meaning of any particular act proceeding from the legislative body. If there should happen to be an irreconcilable variance between the two, that which has the superior obligation and validity ought, of course, to be preferred; in other words, the constitution ought to be preferred to the statute, the intention of the people to the intention of their agents.

"Nor does the conclusion by any means suppose a superiority of the judicial to the legislative power. It only supposes that the power of the people is superior to both; and that where the will of the legislature, declared in its statutes, stands in opposition to that of the people, declared in the constitution, the judges ought to be governed by the latter rather than the former. They ought to regulate their decisions by the fundamental laws rather than by those which

are not fundamental." (The Federalist, Hamilton edition, 576–578.)

Doubtless some consideration of these, among other facts, led Henry Hitchcock, LL. D., a learned lawyer and an accomplished scholar, to say to the students of Michigan University:

"The doctrine that it is the right and duty of the courts to declare void a law repugnant to the constitution, lies at the very root of our system of government." (Const. Hist. as seen in American Law, 77.)

And in an able and exaustive discussion of this subject, under the title "The Legislature and the Courts," Judge Charles B. Elliott says:

"But the change in the form of government from a monarchy to a republic rendered necessary a change in theory as to the location of sovereignty. The absolute authority of parliament as sovereign was now transferred to the people, and the restraints which applied to the executive in the English system became applicable to the new government as a whole. . . .

"The change in location of the sovereignty resulted in raising the judiciary to the position of a coordinate department of government, and the application of the established principles of the common law secured to it a controlling influence over the other departments. The interpretation of the supreme law, being a judicial act, belonged to the judiciary." (5 Political Science Quarterly, June, 1890, 229, 230.)

C. Ellis Stevens, LL. D., D. C. L., in his book, "Sources of the Constitution of the United States," at page 190, says:

"In deciding constitutional questions, the supreme court interprets the law in accordance with principles that have long governed the courts of England. For when an English judge finds conflict between an act of parliament and a judicial decision, he sets aside the decision, as of an authority inferior to that of the act; and if two parliamentary acts conflict, the ear-

Atkinson v. Woodmansee.

lier is set aside as superseded by the later one—the court interpreting the law, simply by determining what *is* law as distinguished from what is not. The range of this English usage was somewhat amplified in the colonies, owing to the fact, that instead of parliament, the colonial courts had legislatures to deal with, which acted, in most instances, under written charters limiting their powers—as also under the general domination of the home government. The colonial judiciary did not hesitate to adjudge a local statute invalid, if its enactment could be shown to have exceeded powers conferred by charter—and the privy council, in the capacity of a supreme court for the colonies, decided in like manner conflicts between laws. When state constitutions succeeded to the charters, the process was continued by the state courts in cases showing conflict between statutes and the new constitutions judicially interpreted. The national government, with a constitution of its own, created an element of superior law, in conflict with which not only state but national enactments of lesser authority are nullified. All that the judiciary does in England, and all that it does in the states, and in the courts of the United States, is to uphold the authority of what it decides to be the higher law, as against all lesser laws or judicial decisions. What therefore has been supposed to be the most unique feature of the American supreme court is really only another adaptation from the past, and rests upon colonial and English precedents.''

For the famous privy council cases, see Thayer's Cases on Constitutional Law.

Referring to the matter of precedents for the decision in the case of *Marbury v. Madison*, Andrew McFarland Davis says :

''There was, however, in the records of the superior court of judicature of the Massachusetts Bay, a decision rendered in 1738 and repeated in 1739, in which the court refused to enforce an order issued by his majesty in council, because the powers of the

Atkinson v. Woodmansee.

court derived through the charter and the laws passed to carry the same into effect were in the judgment of the court inadequate for that purpose. An analysis of the two cases will disclose a certain parallelism. The supreme court of the United States, interpreting the constitution, the source of its authority, declared that it could not in the exercise of original jurisdiction issue writs of mandamus, notwithstanding the action of congress, because no such power was conferred upon the court by that instrument. The superior court of judicature, interpreting in a similar way the province charter, and the laws through which they derived their powers, asserted, that notwithstanding the explicit instructions received from his majesty in council, they were unable to carry out the royal order, because adequate powers were not conferred upon the court." (The case of *Frost v. Leighton,* 2 Am. Hist. Rev. Jan. 1897, 229.)

From the time of the separation of the colonies from the mother country to the time of the federal convention, the power under discussion had been brought to public notice in seven cases, arising in five states. In the case of *Holmes v. Walton,* the question of constitutionality was squarely raised before the supreme court of New Jersey, November 11, 1779, and squarely decided September 7, 1780. The decision, though meeting with some opposition, was ratified by a legislature fresh from the people. Brearly, the chief justice who rendered the decision, Patterson, the attorney-general, and Livingston, the governor of the state, all sat in the federal convention. See American Historical Review, volume 4, page 456, for a careful study of this precedent.

After referring to this case in his contribution, "Constitutional Law," to the volume, "Two Centuries' Growth of American Law," 24, 26, Doctor Baldwin, of Yale University, says :

"Similar decisions followed in other states : some

in those where royal charters were still regarded as in substance an expression of the fundamental law; and others where these had given place to formal constitutions emanating from the people or those who assumed to represent them. In one of these the articles of confederation, under which the United States were then organized, were thus upheld as of paramount authority. Jefferson was among those who, at the time, seems to have approved this doctrine. . . .

"The general approbation with which, as Gerry said, the position that the judiciary were clothed with power to set aside unconstitutional legislation was from the first received, was largely due to the spirit of reverence for law which has always marked the American people, but gained new strength when they began to make and administer law for themselves, in entire independence of British control."

In 19 American Law Review, 184, a critic of the power under discussion, Mr. William M. Meigs, says:

"But it appears that the step had already been made, and that the doctrine was, at or before the adoption of the present constitution, almost a recognized principle in our country. The instances already cited go far to establish this; but when it is seen how opinions to the same effect continued to be expressed and enforced, and almost universally without serious opposition, we think there can be no doubt of it."

In 1893 appeared a volume of more than 400 pages, by Brinton Coxe, of the Philadelphia bar, entitled "Judicial Power and Unconstitutional Legislation," in which he describes his work as follows:

"The chief purpose of the writer is to show that the constitution of the United States contains express texts providing for judicial competency to decide questioned legislation to be constitutional or unconstitutional and to hold it valid or void accordingly.

"Subordinate to this chief purpose are four others. The first of these subordinate purposes is to show that the framers of the constitution, according to the ex-

tant records of their debates and proceedings at Phila-
delphia, in 1787, expressly intended to provide for the
said judicial competency as to such unconstitutional
legislation.

"The second subordinate purpose is to point out
and comment upon certain texts in federal documents
older than the constitution, which are historical ante-
cedents of the constitutional texts concerned.

"The third subordinate purpose is to examine the
history of the relation of judicial power to unconsti-
tutional legislation in certain of the states before and
during the confederation, and to show that the judi-
cial competency under discussion is an American in-
stitution older than the constitution of the United
States." (Pages 1, 2.)

Mr. Austin Scott, in the American Historical Re-
view, volume 4, page 456, says of this book that it
speaks with all but final authority upon its subject-
matter.

In the opinion referred to, the following statement
was made:

"In the early days of the republic, an assumption
by the courts of the right to invalidate acts of the
legislature was bitterly resented. The judges of Rhode
Island and of Ohio were impeached for assuming such
power, and those of Virginia resigned under a storm
of censure on account of like conduct." (*In re Davis,*
58 Kan. 385, 49 Pac. 165.)

It is true that in some instances particular deci-
sions of courts led to factional resentment, but the
statement quoted is quite misleading. The great
democrat, Patrick Henry, had correctly represented
the people of Virginia in the speech quoted above.
The matter of public sentiment nowise entered into
the resignation of judges shown in *Case of the Judges,*
4 Call (Va.), 135, 142, and the true attitude of the

judges themselves is shown in the following extract from the report of those cases :

"On this view of the subject, the following alternatives presented themselves to the court : *Either to decide those questions; or resign their offices.* The latter would have been their choice, if they could have considered the questions as affecting their individual interests only ; but viewing them as relating to their office, and finding themselves called by their country to sustain an important post *as one of the three pillars on which the great fabric of government was erected*, they judged that a resignation would subject them to the reproach of deserting their station, and betraying the sacred interests of society entrusted with them ; and, on that ground, found themselves obliged to decide, however their delicacy might be wounded, or whatever temporary inconveniences might ensue, and in that decision to declare *that the constitution and the act are in opposition and cannot exist together, and that the former must control the operation of the latter.* If this opinion, declaring the supremacy of the constitution, needed any support, it may be found in the opinion of the legislature themselves, who have, in several instances, considered the constitution as prescribing limits to their powers as well as to those of the other departments of government." (4 Call, 142, May, 1788.)

In Ohio, impeachment proceedings were brought against two of the judges, but upon the trial they were acquitted. In Kentucky, an effort to remove the judges failed. In Rhode Island, the judges were cited before the legislature to render reasons for their conduct, but no proceedings in impeachment were initiated.

It must be remembered, however, that in the early days of the republic an armed rabble actually shut up the courts of Massachusetts through nothing more than an ignorant and rebellious malcontentedness ;

and that when the bitterness of partizan rancor in Jefferson's administration demanded a victim, the senate of the United States impeached an insane federal judge upon *ex parte* evidence, without a hearing, and without even an attorney to act in his behalf. These, however, are not pointed out as among the constructive constitutional movements of our country. In every state in the Union the people ultimately approved the power the judges claimed. After the discovery of wheat the American people refused to feed on acorns.

The references given above by no means exhaust the literature upon this great subject, but it seemed to the writer to be due to those who use the Kansas reports that at least some witnesses be called to show that the dogmatic dissenting dissertation referred to does not contain the final word upon the matter of which it treats.

As late as April, 1901, Mr. Justice Brewer deemed it proper, in the case of *Fairbank v. United States*, 181 U. S. 283, 21 Sup. Ct. 648, 45 L. Ed. 862, to quote again from the often-quoted language of Chief Justice Marshall in *Marbury v. Madison*, 1 Cranch, 137, 2 L. Ed. 60, as follows:

"The constitution is either a superior paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and, like other acts, is alterable when the legislature shall please to alter it.

"If the former part of the alternative be true, then a legislative act contrary to the constitution is not law; if the latter part be true, then written constitutions are absurd attempts, on the part of the people, to limit a power in its own nature illimitable.

"Certainly all those who have framed written constitutions contemplate them as forming the fundamental and paramount law of the nation, and conse-

quently the theory of every such government must be that an act of the legislature repugnant to the constitution is void.

"This theory is essentially attached to a written constitution, and is consequently to be considered, by this court, as one of the fundamental principles of our society. . . .

"It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each.

"So if a law be in opposition to the constitution, if both the law and the constitution apply to a particular case, so that the court must either decide that case conformably to the law, disregarding the constitution, or conformably to the constitution, disregarding the law, the court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty.

"If, then, the courts are to regard the constitution, and the constitution is superior to any ordinary act of the legislature, the constitution, and not such ordinary act, must govern the case to which they both apply. . . .

"The particular phraseology of the constitution of the United States confirms and strengthens the principle, supposed to be essential to all written constitutions, that a law repugnant to the constitution is void, and that courts as well as other departments are bound by that instrument."

The district court is directed to modify its judgment by striking out the sum of twenty-five dollars from the taxed costs. The judgment as modified is affirmed. The costs in this court are divided.

All the Justices concurring.