[No. 92. Third Appellate District.—June 20, 1905.]

## In Re J. W. FINLEY, on Habeas Corpus.

CRIMINAL LAW—MALICIOUS ASSAULT WITH DEADLY WEAPON BY CONVICT FOR LIFE—DEATH PENALTY—CONSTITUTIONAL LAW.—Section 246 of the Penal Code, imposing the death penalty upon a person undergoing a life sentence in the state prison who, with malice aforethought, commits an assault upon the person of another with a deadly weapon, or by any means or force likely to produce bodily injury, is constitutional, and does not inflict any cruel or unusual punishment nor deny the equal protection of the law.

ID.—DOUBTS RESOLVED IN FAVOR OF VALIDITY.—No statute is to be declared unconstitutional unless its conflict with the constitution is clear, substantial, and incapable of reconciliation; and every presumption and intendment aids, and every doubt is to be resolved in favor of, the validity of the statute assailed.

ID.—EXCEPTIONAL PENALTIES FOR EXCEPTIONAL CRIMES.—The legislature may attach exceptional penalties to crimes which are exceptional in their nature or attended by exceptional circumstances.

ID.—DEATH PENALTY NOT CRUEL NOR DISPROPORTIONATE TO OFFENSE —The death penalty is not cruel *per se;* and cannot be said to be disproportionate to the offense punished by section 246 of the Penal Code.

ID.—EQUAL PROTECTION OF THE LAW—CLASSIFICATION.—The equal protection of the law is not denied where there is a proper classification, and every one who stands in the same relation to the law is treated equally in the same manner under the same circumstances and conditions.

APPLICATION for Writ of Habeas Corpus to the Sheriff of Sacramento County.

The facts are stated in the opinion of the court.

Samuel T. Bush, H. C. Ross, and W. F. Renfro, *Amicus Curiae,* for Petitioner.

A. M. Seymour, District Attorney, for Respondent.

McLAUGHLIN, J.—Application for writ of *habeas corpus.*

The petitioner, while undergoing a life sentence in the state prison at Folsom, was indicted for the crime defined in section 246 of the Penal Code, and is now confined in the county jail of Sacramento County awaiting trial for said crime.

The section upon which the indictment is based reads as follows: "Every person undergoing a *life sentence* in a state prison of this state, who, *with malice aforethought,* commits an assault upon the person of another with a deadly weapon or instrument, or by any means or force likely to produce great bodily injury, is *punishable with death.*"

It is contended that the indictment is void and the restraint under it illegal, for the reason that section 246 contravenes sections 6, 11, and 13 of article I and subdivision 2 of section 25 of article IV of the constitution of the state, and the fifth, eighth, and fourteenth amendments to the constitution of the United States.

1. *Rules of construction.*

Questions involving the constitutionality of statutes always invite careful consideration of the relation between the legislative and judicial departments of government.

These departments are co-ordinate, and, being of equal rank, it follows, necessarily, that courts should never annul or impair an act of the legislature, unless it is plainly and palpably in conflict with that supreme law which limits and controls the exercise of power by all branches of government.

In a sense, the legislative is the highest department of state government. The few restrictions found in state and federal constitutions embrace the only limitations on its power; while the powers and duties of the other departments are limited not only by constitutions, but by legislative enactment.

These reflections admonish us that, while courts should fearlessly and conscientiously interpret laws, whether found in constitutions or statutes, such power of construction should be exercised with *extreme caution* when the validity of a statute is questioned. They also point to the reason for, and basis of rules, which command that no statute shall be declared violative of constitutional provisions, unless the conflict is clear, substantial, and incapable of reconciliation. In this way attention is directed to the principle underlying the doctrine that every presumption and intendment aids, and that every doubt must be resolved in favor of, the validity of the statute assailed. (Cooley on Constitutional Limitations, pp. 233, 235, 237, 240, 252, 253; Endlich on Interpretation of Statutes, sec. 178; Sutherland on Statutory Construction, sec. 82; Gillett's Criminal Law, sec. 26; *Brown* v. *Walker,* 161 U. S. 596, [16 Sup. Ct. 644]; *Booth* v. *Illinois,* 184 U. S. 431, [22 Sup. Ct. 425]; *Bourland* v. *Hildreth,* 26 Cal. 180; *University* v. *Bernard,* 57 Cal. 613; *People* v. *Hayne,* 83 Cal. 116, 117, [17 Am. St. Rep..211]; *Bates* v. *Gregory,* 89 Cal. 394, [26 Pac. 891]; *In re Madera Irrigation Dist.,* 92 Cal. 307, 308, [27 Am. St. Rep. 106, 28 Pac. 272].)

These rules and principles force the conclusion that this court must be *entirely satisfied and convinced* that the legislature has abused its great discretionary power and overstepped constitutional limitations before we can be justified in declaring section 246 unconstitutional and void.

There is no room for conjecture or surmise, sympathy or deprecation. We are not privileged to discuss the wisdom or

advisability of this legislation, nor to indulge in speculation touching possible effects.

The question is purely one of law. Does this enactment subject the petitioner to cruel or unusual punishment? Is it special, discriminating, or unequal? Does it deny to him that equal protection which the law accords to all alike, be they exalted or lowly, saints or sinners? Upon the answers to these questions, the answer. to the main question depends. These answers must be sought through the light of legal principles, and the investigation must be shorn of every vestige of prejudice or favor. It would be profitless to indulge in a homily touching the relations between the national and state governments, and quite as useless to sermonize on the point that some provisions of the higher constitution relied upon cannot be invoked to nullify or in any way affect the legislation of a sovereign state. The rules of construction as to both constitutions, so far as the question before us is concerned, are identical. Every point made by the petitioner is covered by provisions of our state organic law, and hence the validity of this statute will be tested by that standard. But, as federal questions are undoubtedly involved, due weight will be given to decisions by the federal courts.

### 2. *Is the punishment cruel or unusual?*

In considering this question the warm impulses of the heart must be stifled, for we are to remember that it is not pity for the culprit, nor resentment for his crime, but cold, dispassionate rules of law, which can lead us to an impartial and correct conclusion. Every human man feels a pitying regret whenever the death sentence has been, or may be, pronounced against a fellow-creature. But human experience, crystallized into law, teaches that very severe penalties are unfortunately necessary to deter men from defying law and daring the consequences. The function of defining crimes and fixing punishments has always been considered a matter of legislative discretion in the very broadest sense. For the judicial department to fix a nicely adjusted maximum or minimum scale for admeasuring penalties for crime would be as much an act of usurpation as if that department should attempt to enumerate the acts which would entail penal consequences. It is therefore for the legislature alone to define crimes and fix the punishment which may be inflicted. It is

only when the punishment is out of all proportion to the offense, and is beyond question an *extraordinary penalty* for a crime of *ordinary gravity committed under ordinary circumstances,* that courts may denounce it as *unusual.*

And a penalty can never be declared *cruel* unless it shocks the moral sense and outrages those innate principles of humanity which have been broadened and expanded by civilized enlightenment. It could hardly be contended that the death penalty is cruel *per se,* for the whole current of law for centuries justifies its infliction.

Hence we assume that the point here made is, that it is *excessive in degree,* and therefore inhibited.

This and other questions which are to follow seem to make this a case of first impression, for an industrious search by counsel, supplemented by an extensive and patient research by the court, has failed to disclose a parallel case. It is therefore of high importance that each proposition should be fully and clearly stated and decided, and this will, we trust, excuse any seeming verbosity.

It must be admitted that every person, *whether felon or freeman,* should be punished for making a deadly assault on another. This, then, suggests an inquiry as to the punishment which could be inflicted on a guilty life convict, if the judgment of death be not permissible.

Through his own misconduct, such convict has forever forfeited his liberty and has suffered civil death. The only remaining right or privilege he can forfeit is his physical life. The limit of ordinary punishment has been reached; and if this only remaining penalty cannot be inflicted, then such convict stands immune from further human retribution.

The necessity for such punishment cannot be questioned. So sweet is liberty that men will do and dare anything to gain it. And when a man has forfeited that liberty, when the song of every bird and the breath of every zephyr tells the tantalizing story of privileges forever lost, desperation and despair makes the victim, especially if naturally depraved, a dangerous and daring man. Under such circumstances he will be careless of other lives and all consequences. It is then absolutely necessary that those who come in contact with him should be carefully protected against his reckless and certainly against his *malicious* and *deliberate acts.* But it was

urged in argument that such convicts can be punished by solitary confinement, a diet of bread and water, and other penalties now in use as part of prison discipline. The obvious answer to this is, that every convict, whatever his term, is subject to such penalties for *ordinary* infractions of prison rules. This is an incident attaching to the judgment already pronounced against him. But when a life convict commits an act amounting to far more than a mere infraction of disciplinary rules, an act denounced as a grave and dangerous crime in every criminal code, for us to declare that such penalties are the only ones that can be decreed as punishment for such act, would be to say with deliberate solemnity that the law not only tolerates but should *command* an idle act.

Such argument rebounds from reason back upon itself, and proves that such penalties, in addition to being ridiculously inadequate, would be no punishment at all.

And if such penalties *had* been declared in section 246, and *one* or *all* of them had been extended for any *definite term*, or to the *limit of imprisonment*, the same question here presented would still exist.

In that event counsel as industrious, astute, and ingenious would contend, under the same rules and authorities, that such punishment was of greater severity than could be meted out to other offenders, and was therefore excessive.

We could *then* decide only as we do *now*, that in view of the necessity for some adequate punishment, and the extraordinary circumstances surrounding the commission of this grave offense, the legislative discretion has not been abused, for the reason that within the domain of logic and law we can conceive of no other adequate penalty which could be inflicted.

We agree with counsel that the infliction of the death penalty in such cases is awful, and may add that its infliction in *any* case is likewise awful. But sentiment must give way to duty. Crime must be punished and prevented and lives must be protected; and while such arguments might properly be addressed to legislative discretion, they can have no weight here.

The legislature may attach exceptional penalties to crimes exceptional in their nature, or attended by exceptional circumstances, and this is such a case. Therefore, we can only bow to the mandate of that department, finding comfort in

the thought that life convicts, in common with other men, may escape penalties by behaving themselves.

We are, however, unwilling to rest a decision fraught with such grave import to a fellow-creature upon our own unsupported reasoning. In *Territory* v. *Ketcham*, 10 N. Mex. 718, [65 Pac. 169], the defendant had been convicted and sentenced to death under a statute making it a capital offense to "willfully and maliciously make an assault upon any railroad train, railroad cars, or railroad locomotives, for the purpose, and with the intent, to commit murder, robbery, or any other felony, upon or against any passenger on said train or cars, or upon or against any express messenger, mail agent, engineer, conductor, fireman, brakeman, or other employee of said trains," etc.

The validity of that statute was assailed upon the very grounds here urged; and the supreme court of New Mexico not only held the penalty within the discretion of the legislature, but went much further, saying: "The question whether the punishment is too severe and disproportionate to the offense is for the legislature to determine. . . . Counsel for defendant claims that, as properly understood, it means, when used in this connection, punishment out of proportion to the offense. If by this is meant the degree of punishment, we do not think the contention correct. . . . It was never designed to abridge or limit the selection by the lawmaking power of such kind of punishment as was deemed most effective in the punishment of crime."

We deem it unnecessary to express either concurrence or dissent touching this extreme view, but invite attention to the many authorities cited to sustain the text, thus avoiding undue prolixity here.

A similar statute has been a law of this state for fourteen years, and, though two bitterly contested prosecutions were had under it, it stands unimpaired. If, as was said in the earliest of these cases, the "necessity of the times" justified such severe measures for "preventing train-wrecking and punishing train-wreckers," it is difficult to understand why the exigencies of a peculiar and dangerous situation would not justify equally severe measures, if necessary to restrain or punish hope-abandoned felons. (Pen. Code, sec. 218; *People* v. *Thompson*, 111 Cal. 245, [43 Pac. 748]; *People* v. *Wor-*

*thington,* 115 Cal. 245, [46 Pac. 1061] ; *People* v. *Lovren,* 119 Cal. 91, [51 Pac. 22, 639].)

In *People.* v. *Williams,* 30 South. 337, the supreme court of Alabama held a statute nearly like ours constitutional. The only difference between that statute and the one under consideration is that the former makes *murder* by a convict punishable with death. (See, also, Tiedeman on Limitations on Police Power, secs. 10, 11, 31.)

### 3. *Classification as denying equality.*

The grandest principle of our law, rightly termed the safeguard of our liberties and institutions, is that firmly fixed but sometimes misunderstood rule against discrimination between persons or classes merely because they are such. "Misunderstood," we say, because it is sometimes difficult to understand what constitutes discrimination between persons or classes of persons. The reason—aptly termed the "soul" of a law—furnishes an unerring guide to its proper interpretation. Knowing that the reason supporting this rule is the idea that "all men stand equal before the law," we readily see that, in a broad sense, this means equal rights, duties, privileges, and burdens, under laws bearing equally upon all citizens. But when we stop to consider the rights of persons, in view of their relations to other persons and to organized society, and think of the varied conditions arising from vocations and circumstances, creating variant necessities, responsibilities, and duties, we can as readily see that this cannot mean that *every law* must *at all times* apply to *every person* in the *same way.*

Nothing could bring about greater inequality or create more onerous burdens than the strict application of such a rule as this. It would never do to subject the farmer, upon whom all depend, to the same restrictions imposed upon callings deemed injurious instead of beneficial to society. Nor to class tanneries and powder-works with the business of the baker and tailor, which are not offensive or dangerous to any one. It would be burdensome in the extreme, as well as impracticable and unnecessary, to compel the ordinary laborer to submit to regulation in the conduct of his calling, and to examination, in order that he might be certified *a la* the teacher, physician, and lawyer. All men cannot be grocers, druggists, or merchants. All do not conduct saloons, the-

aters, slaughter-houses, or hospitals. Happily all men are not lawyers, and unfortunately all cannot hold public office.

Hence, we have an infinite variety of laws, based upon the necessity for regulating the conduct of professional men and public servants, and placing restrictions upon business according to its harmful or beneficial relation toward public health, safety, convenience, or happiness, *ad infinitum.*

Railroads, owing to sparks and speed, make the danger of fire or accident greater than attends other methods of inland transportation; hence the necessity for special rules as to the conduct of such business and touching damage for lack of special precautions and care. All men have a right to use public streets and roads, but all must submit to special rules regulating the use thereof. All have a right to enter public buildings and grounds, but attendants guard the entrance to offices where busy men attend to public duties, and the stroller is frequently admonished to "Keep off the grass." Thus, in the infinite variety of human vocations and character, in the vast compass of human achievement, and great, small, and intermediate human activities, do we find the secret of inequalities, making necessary general laws, adapted to the duties, responsibilities, and necessities arising from conditions and circumstances, and hence applying only to certain classes. And so it is with crime. All crimes are not of the same gravity or nature, and criminals vary in recklessness, depravity, and cruelty. Again, all crimes are not committed in the daytime, nor under the same conditions and circumstances. Of necessity, then, crimes and criminals have ever been divided into classes, and penalties ranging from a nominal fine to the supreme expiation of a forfeited life have been inflicted.

From these considerations we evolve the rule and necessity for classification, according to conditions, vocations, circumstances, duties, and responsibilities, attending the relations of individuals toward the public and toward government in any or all of its branches. Nor are we left groping as to *restrictions* upon such classification. They flow as a logical sequence from the very *necessity* which compels separation into classes. That *necessity* rests upon essential differences in the relations of men toward their fellows and the state, and so do the *restrictions.*

These restrictions may be briefly described by saying that classification must ·not be arbitrary nor result from mere caprice or the desire or ability to separate and classify. It must not be based on mere physical characteristics, such as height, weight, complexion, or age, nor on race, nativity, mentality, or other personal attribute, which pertains solely to the particular person, and not to any *relation* that person may bear to other persons in the scope of human conduct and activity. Nor may it be predicated upon religious belief, for that pertains to relations between Creator and creature which · concern only the individual worshiper, and it is not within the range of enlightened law to question the propriety of such worship, nor make equality depend upon the shrine at which the citizen may kneel.

It must rest upon some substantial, inherent, intrinsic difference or distinction in the relation of the particular class toward the lives, safety, property, health, happiness, or convenience of the public, when contrasted with the relation, duties, responsibilities, position, or situation of other persons or classes toward the same matters of public concern. (*Missouri* v. *Mackey,* 127 U. S. 209, [8 Sup. Ct. 1161] ; *Mugler* v. *Kansas,* 123 U. S. 667-669, [8 Sup. Ct. 273] ; *Minneapolis* v. *Beckwith,* 129 U. S. 33, [9 Sup. Ct. 207] ; *Holden* v. *Hardy,* 169 U. S. 366, [18 Sup. Ct. 383] ; *Atchison etc. R. R. Co.* v. *Matthews,* 174 U. S. 96, [19 Sup. Ct. 609] ; *St. P. R. R. Co.* v. *Matthews,* 165 U. S. 25; *L'Hote* v. *New Orleans,* 177 U. S. 597, [20 Sup. Ct. 788] ; *Gulf etc. R. R. Co.* v. *Ellis,* 165 U. S. 155, [17 Sup. Ct. 255] ; *Estate of Campbell,* 143 Cal. 623, [77 Pac. 674] ; *Ex parte Jentzsch,* 112 Cal. 474, [44 Pac. 802] ; *Pasadena* v. *Stimson,* 91 Cal. 238, [27 Pac. 604] ; *State* v. *Fraternal Order,* 35 Wash. 338, [77 Pac. 502] ; *Ex parte Northrup,* 41 Or. 489, [69 Pac. 445] ; *Atkinson* v. *Woodmansie,* 68 Kan. 71, [74 Pac. 641] ; Sutherland's Notes on U. S. Constitution, p. 728 et seq.; Story on the Constitution, sec. 1961; Cooley on Constitutional Limitations, p. 562 et seq.; Brannan on Fourteenth Amendment, p. 323 et seq.) These authorities not only sustain the proposition to which they are cited, but throw much light on the question to be hereafter determined.

But it is claimed that in the case at bar there is no such difference or distinction as would justify discrimination between life convicts and other felons who make deadly assaults.

We have already noticed *one* very important difference, based on the hopeless and desperate situation in which such convicts are placed, and the utter inability to inflict other adequate punishment upon them.

But there is another important difference. In every state of this Union and elsewhere penalties have always been graded and classified according to the gravity of the crime and situation or character of the criminal.

Our own Penal Code abounds with illustrations proving this assertion. *Burglary* is punished according to the *time* the offense is committed. *Arson* according to the *habitancy* of the premises set on fire. *Assaults* according to the *use of corrosive or caustic substances. Bribery* according to the *position* of the official or person bribed. *Embezzlement* according to *official capacity* and the *character* of property stolen. (See appropriate sections of the Penal Code.)

But the strongest analogy exists between the section here assailed and chapters 2 and 3 of the Penal Code, relating to rescues and escapes. There, as here, the punishment is classified according to the *term* for which the prisoner was incarcerated. These sections are based on a very ancient statute, and the principle is entitled to veneration for its age and respect for the soundness long-continued sanction evidences. (2 Bishop on Criminal Law, secs. 1070-1090.) But even stronger is the analogy between section 246 and section 666. The latter section makes the penalty depend upon prior conviction, and upon the term for which the offender *might have been sentenced* on his original conviction, and the *gravity* of the original offense. This section has been assailed on constitutional grounds, and the decision sustaining its validity has been cited with approval by courts of last resort in Massachusetts, Wisconsin, Missouri, and Kentucky, where similar statutes were questioned, as well as by the supreme court of the United States. (*People* v. *Stanley,* 47 Cal. 113, [17 Am. Rep. 401] ; *McDonald* v. *Commonwealth,* 173 Mass. 322, [17 Am. St. Rep. 293, 53 N. E. 874, 180 U. S. 311, 21 Sup. Ct. 389] ; *Moore* v. *Missouri,* 159 U. S. 675, [16 Sup. Ct. 179] ; *In re Boggs,* 45 Fed. 475; *Ingalls* v. *State,* 48 Wis. 647, [4 N. W. 785] ; 2 Bishop on Criminal Law, sec. 959.) Such decision has also been approved by our own supreme court in language too plain to be misunderstood.

(*People* v. *Coleman,* 145 Cal. 612, 613, [79 Pac. 283].)    If classification of crimes and penalties may properly be based on terms of three, five, ten, or any definite number of years, there can be no logical reason why it may not be based on a life term, nor why *life* as well as *liberty* may not be the forfeit.    We have preferred to place our decision on this point on broad grounds.    It may, however, be remarked, before passing to other questions, that sections 245 and 246 of the Penal Code define and punish very different offenses. It is manifest that convicts already imprisoned for life cannot be further punished under section 245.    It is plainly apparent from section 246 that it was designed to provide suitable punishment for such offenders, when there was added to the deadly assault the elements of deliberation and malice. This in itself justifies the classification.    But waiving this, the classification is in no sense arbitrary or capricious.    It is based on natural, palpable, substantial, and inherent distinctions too plainly marked to be ignored.    As was said in argument, it may be that men, good but unfortunate, may sometimes be imprisoned for life.    Waiving the rarity and improbability of this, and also waiving the fact that if it be true the scrrow and humiliation of such men will furnish ample security against further misconduct on their part, we are again constrained to say that such considerations are for other departments, and therefore they cannot have force here. This argument, however, was directed to the point that the statute is invalid, because it subjects the convict to double punishment and gives the court power, on first conviction, to declare the penalty which must attach to subsequent transgression.    But the same results would obtain in all cases where an increased punishment may be imposed upon offenders twice or thrice convicted, and both propositions were considered and settled in the last line of authorities cited.

4. *Due process of law—Uniformity of operation—Equal protection of the law—General and special laws.*

The reasoning indulged in and the authorities cited touching classification apply with equal force to all questions above enumerated.    After all, the one broad principle of "equality before the law" is the test which must be applied to each. Therefore, if we have reached a comprehension of the neces-

I Cal. App.—14

sity for classification, and of the reasons requiring separation into classes, we can have little difficulty in understanding the meaning of phrases used in the above subhead. If the multifarious concerns of life result in inequalities affecting man's relation to the purpose of government, and consequent necessity compels classification, in order to prevent resulting and concurrent inequalities in the operation and effect of laws, it follows by the unerring force of reason and logic that if every person, standing in the same situation and relation, under the same conditions, would be punished in the same way under the same law, there is no inequality. This is established by an infinite number of authorities, from a few of which we will borrow apt quotations. "The right to the equal protection of the laws is not denied, when it is apparent that the *same law or course of proceedings would be applied to any other person in the state* under similar circumstances and conditions." (*Tinsley* v. *Anderson,* 171 U. S. 101, [18 Sup. Ct. 805] ; Brannan on Fourteenth Amendment, p. 322, 323.) "Class legislation discriminating against some and favoring others is prohibited, but legislation which, in carrying out a public purpose, is limited in its application, if *within the sphere of its operation* it affects all persons *similarly situated,* is not within the [fourteenth] amendment." (*Barbier* v. *Connolly,* 113 U. S. 27, [5 Sup. Ct. 357] ; *French* v. *Davidson,* 143 Cal. 662, [77 Pac. 663].) "The fourteenth amendment to the constitution of the United States does not prohibit legislation which is limited either in the objects to which it is directed, or by the territory within which it is to operate. It merely requires that all persons *subjected to such legislation* shall be *treated alike* under *like circumstances and conditions,* both in the privileges conferred and in the liabilities imposed." (*Hayes* v. *Missouri,* 120 U. S. 71, [7 Sup. Ct. 350] ; *Brown* v. *New Jersey,* 175 U. S. 177, [20 Sup. Ct. 77] ; *Marchant* v. *Pennsylvania,* 153 U. S. 389, [14 Sup. Ct. 894] ; *Giozza* v. *Tiernan,* 148 U. S. 662, [13 Sup. Ct. 721] ; *Cody* v. *Murphy,* 89 Cal. 524, [26 Pac. 1081] ; *Smith* v. *McDermott,* 93 Cal. 425, [29 Pac. 34] ; *In re Converse,* 137 U. S. 631, [11 Sup. Ct. 191] ; *Missouri* v. *Lewis,* 101 U. S. 22.)

In *Leeper* v. *Texas,* 139 U. S. 467, [11 Sup. Ct. 577], it is said that "By the fourteenth amendment the powers of

states in dealing with crime within their borders are not limited, except that no state can deprive particular persons or classes of persons of equal and impartial justice under the law; *that law in its regular course of administration through courts of justice is due process,* and when secured by the law of the state the constitutional requirement is satisfied." (*People* v. *Coleman,* 145 Cal. 615, [79 Pac. 283].) "An act to be general in its scope need not include all classes of individuals in the state. It answers constitutional requirements if it relates to and operates upon the *whole of any single class.*" (*Abeel* v. *Clark,* 84 Cal. 230, [24 Pac. 383].)

We might multiply quotations, but the few we have embodied will answer every purpose; yet profit could be derived from consulting *Pace* v. *Alabama,* 106 U. S. 583; *Jones* v. *Brim,* 165 U. S. 183, 184, [17 Sup. Ct. 281]; *L'Hote etc.* v. *New Orleans,* 177 U. S. 597, [20 Sup. Ct. 788]; *Minder* v. *Georgia,* 183 U. S. 562, [22 Sup. Ct. 224]; *McDonald* v. *Connell,* 99 Cal. 386, [34 Pac. 71]; *Aikins* v. *Wisconsin,* 195 U. S. 205, [25 Sup. Ct. 3]; *West* v. *Louisiana,* 194 U. S. 263, [24 Sup. Ct. 650]; *Turner* v. *Williams,* 194 U. S. 293, [24 Sup. Ct. 719]; *M. K. T. Ry.* v. *May,* 194 U. S. 269, [24 Sup. Ct. 638]; *Cincinnati St. Ry.* v. *Snell,* 193 U. S. 37, [24 Sup. Ct. 319]; *Detroit Ry. Co.* v. *Osborn,* 189 U. S. 389, [23 Sup. Ct. 540]; *Hager* v. *Reclamation Dist.,* 111 U. S. 708, [4 Sup. Ct. 663]; *Otis* v. *Parker,* 187 U. S. 609, [23 Sup. Ct. 167].

In *State* v. *Lewin,* 53 Kan. 679, [37 Pac. 169], we find nothing which, well considered, runs counter to the general current of authority. There a summary trial without a jury was provided for, and the punishment was made the same as the original sentence, whether long or short, and was not therefore the same as to all like offenders. The law applied to *all convicts,* yet the prisoner sentenced for one year would go back for one year and the prisoner sentenced for ten years would go back for ten. This made the punishment grossly unequal. In the case at bar, all convicts imprisoned for life are treated alike, under a statute applying to them only. Herein lies the difference between the law there held invalid and the statute here under consideration. But if that case did sustain petitioner's contention, it must fall before the rules of logic and reason pointing to the correctness of the

array of authorities sustaining the conclusion we have reached. Section 246 applies to every person in this state. All may avoid the class, but none within the class are discriminated against. There is no distinction based on race, creed, age, sex, or personal characteristics. Those who by lawless acts bring themselves within its scope must heed the warning it contains. If they fail to do so, they, and not the law, must be held responsible for the terrible consequences entailed by their deliberate acts.

The writ is denied and the prisoner remanded to the custody of the sheriff of Sacramento County.

Chipman, P. J., and Buckles, J., concurred.