Filed 2/11/15  P. v. Dowdell CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>BADYR JABRON DOWDELL,<br><br>　　　　Defendant and Appellant. | A138140<br><br>(Mendocino County Super. Ct.<br>　No. SCUKCRCR1221781)<br><br>**ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>NO CHANGE IN JUDGMENT** |

The petition for rehearing filed on January 30, 2015, is denied.

The opinion filed on January 15, 2015, is modified as follows:

(1)  On page 9 of the opinion, delete footnote 3.

(2)  On page 11, in the last paragraph, delete part of the third sentence beginning with:  "obvious possibility that his sentence could have been far greater in that tragic event.  As"

Replace the deleted sentence with the following, to read:

"fact that his sentence could have been the same or far greater in that tragic event. First, while appellant argues that, if the child had died, the prosecutor could not have charged him with violating section 273a and also alleged an enhancement under section 12022.7, caselaw is to the contrary.  In *People v. Corban* (2006) 138 Cal.App.4th 1111, 1118-1119, the defendant pleaded no contest to a count of involuntary manslaughter and

1

a violation of section 273a, admitting a section 12022.7 enhancement attached to the latter, then argued on appeal that the enhancement was improper because only a section 12022.95 enhancement could apply where the victim died. The *Corban* court found " 'no indication that the Legislature intended' section 12022.95 'to supplant, rather than supplement' section 12022.7, subdivision (d)," and held that whether to allege an enhancement under section 12022.95 or under section 12022.7 was a matter of prosecutorial discretion even where the victim died. (*Corban*, at pp. 1118-1119, quoting *People v. Bertoldo* (1978) 77 Cal.App.3d 627, 634; see also, *People v. Martinez* (2014) 226 Cal.App.4th 1169, 1181-1184 [section 12022.7 enhancement properly attached to count of furnishing controlled substance where defendant also convicted of manslaughter].)

Moreover, as . . ."

(3) On page 12, at the top of the page, delete last sentence of this paragraph, which reads: "Appellant's reply brief does not respond to this point."

Add new paragraphs immediately following the above deletion and preceding the current first full paragraph, as follows:

"Although appellant's reply brief did not respond to this point, he argues on a petition for rehearing that section 273ab is not comparable to the offense he admitted— abusing or endangering the health of a child—because conviction of section 273ab requires an assault by means of force likely to produce great bodily injury, with awareness of that likelihood, while section 273a, subdivision (a), can be violated without subjective awareness of the risk of harm. (*People v. Valdez* (2002) 27 Cal.4th 778, 790.) *Valdez* explained that violation of section 273a, subdivision (a), by direct infliction of harm is a general intent crime, its mens rea "the intent to perform the underlying injurious act." (*Id.* at p. 786.) When section 273, subdivision (a), is violated by indirect infliction of harm, the standard is criminal negligence (*id.* at p. 788), with knowledge of the risk " 'determined by an objective test: "[I]f a reasonable person in defendant's position would have been aware of the risk involved, then defendant is presumed to have had such an awareness." ' " (*Id.* at p. 783, quoting *Williams v. Garcetti* (1993) 5 Cal.4th 561, 574.)

2

But subjective awareness is not required for conviction under section 273ab either. Consistent with [*People v.*] *Williams* [(2001) 26 Cal.4th 779], a defendant may be guilty of an assault within the meaning of section 273ab if he acts with awareness of facts that would lead a reasonable person to realize that great bodily injury would directly, naturally, and probably result from his act.  (See *Williams*, at p. 788.) The defendant, however, need not know or be subjectively aware that his act is capable of causing great bodily injury.  ([*People v.*] *Albritton* (1998)] 67 Cal.App.4th [647,] 658–659.)  This means the requisite mens rea may be found even when the defendant honestly believes his act is not likely to result in such injury.  (See *Williams,* at p. 788, fn. 3.)"  (*People v. Wyatt* (2010) 48 Cal.4th 776, 781.)"

In the last sentence of first full paragraph, immediately after "charged" insert the following:

"as he was, under section 273a, subdivision (a), with an enhancement under section 12022.7, or"

The new full sentence should read:

"Again, this argument ignores the fact that if Damian had died appellant could have been charged, as he was, under section 273a, subdivision (a), with an enhancement under section 12022.7, or under section 273ab, which carries a minimum 25 year and potential life sentence."

In the last sentence of the second full paragraph, directly following "but it is" insert the following:  "equal to or"

In same sentence, replace "equally" with "as"

The new sentence should read:

"His sentence may be longer than one which *might* have resulted from a prosecution based on the child's death but it is equal to or far shorter than another that appears at least as likely to have resulted."

(4)  On page 20, in first sentence of first full paragraph, after "In sum," delete the following:

"the court reached a thoughtful and balanced decision on sentencing."

Replace deleted text with the following:

"while the court imposed a lengthy sentence, it is clear that it did so after careful thought and balancing of the relevant factors."

At end of the last sentence of first full paragraph ("We find no abuse of discretion.") add the following text as the new footnote 7:

"In his reply to the Attorney General's response to appellant's petition for rehearing, appellant suggests that Damian's follow-up x-rays may not support Dr. Crawford's view of the severity of the child's injuries. Appellant's counsel represents that he only recently obtained these x-rays, despite more than a year of efforts to do so, and that he intends to ask Dr. Crawford and radiologists at Children's Hospital whether the follow-up x-rays show "signs of healing fractures associated with the area of bruising and whether, if there are any such signs, they are consistent with a violent assault and inconsistent with accidental dropping of the infant." Depending upon the responses to these inquiries, counsel states, he may file a petition for writ of habeas corpus raising the issues of 1) the prosecution's failure to obtain and disclose potentially exculpatory evidence; 2) ineffective assistance of counsel in failing to obtain this evidence and consult with an independent expert before advising appellant to plead guilty as charged; and 3) the trial court's reliance upon unreliable aggravating evidence."

There is no change in judgment.


Dated:_____                    _____
                                          Kline, P.J.

4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>BADYR JABRON DOWDELL,<br><br>  Defendant and Appellant. | A138140<br><br>(Mendocino County Super. Ct.<br> No. SCUKCRCR1221781) |

Badyr Jabron Dowdell appeals from a conviction of abusing or endangering the life of his infant son, with an enhancement for inflicting great bodily injury, entered upon his guilty plea. He contends his nine-year prison sentence constitutes unconstitutionally "unusual" punishment; the court's reasons for imposing middle sentences on the offense and enhancement were unsupported by the record and irrational; and he received ineffective assistance of counsel due to his attorney's failure to object to these sentencing errors and ask the court to strike the great bodily injury enhancement. We affirm.

**STATEMENT OF THE CASE**

Appellant was charged by information filed on July 7, 2012, with abusing or endangering the health of an infant (Pen. Code, § 273a, subd. (a)). It was alleged that during commission of the offense, appellant inflicted great bodily injury upon a child under the age of five years. (§ 12022.7, subd. (d).)

On August 1, the court granted a defense request to continue the trial because its expert witness would need up to eight weeks to complete a full analysis and report.

1

On October 23, appellant pled guilty and admitted the enhancement allegation. There was no plea agreement. The court explained to appellant that he could be sentenced to a total term of up to 12 years, that the court would impose sentence based on the probation department's recommendation, and that because the offense to which he was pleading guilty was a strike, he would not be entitled to half-time credit and would be required to serve at least 85 percent of his sentence.

On February 5, 2013, appellant was sentenced to a total prison term of nine years, consisting of the middle term of four years on the offense and a consecutive middle term of five years on the enhancement.

Appellant filed a timely notice of appeal on March 12, 2013.

## STATEMENT OF FACTS

Appellant and Caitlyn Hulbert are the parents of Damian Dowdell-Hulbert. At the time of the incident, appellant was 24 years old; Damian was two months old. As set forth in the probation report, Ukiah Police Detective Pintane contacted Hulbert on April 30, 2012, after receiving a referral from Child Welfare Services. Hulbert told the detective that on April 26, she had left Damian with appellant for the day. When she returned about 4:30 p.m., she noticed Damian was not acting normally: He would repeatedly fall asleep, then wake up and cry in apparent discomfort, whereas he was usually happy and smiling. She asked appellant what was wrong and he said Damian had been fine all day. She gave the baby Children's Tylenol and a bottle and put him down to sleep, then had dinner with appellant and prepared to leave about 9:00 p.m.

When Damian woke up, he started crying and acting fussy. Hulbert arrived at home in Lakeport about an hour later. She undressed Damian and lay him on his back, and he started to cry again. She rolled him over and saw bruising covering most of his back. Hulbert took him to Sutter Hospital in Lakeport, where she was told they were not equipped to handle a small child and he would need to be flown to Children's Hospital in Oakland. When Hulbert arrived at the hospital, medical staff told her Damian was not permanently injured and could be released. Hulbert spoke with a specialist who told her

2

that, in his opinion, the bruising was not the result of an accident but most likely was from being hit too hard on the back.

While at the hospital, Hulbert called appellant. He admitted that he had dropped Damian, picked him up and tried to comfort him by patting his back, and that maybe he had patted the baby too hard. Appellant told Hulbert he had lied to her because he was scared. He said he felt bad because he realized that he was being selfish by lying, and his child's safety should have been more important.

Hulbert told Detective Pintane she did not think appellant would ever intentionally hurt Damian but she agreed he should have told her what happened right away. She sent Pintane photographs of Damian's back she had taken that evening, telling him that a dark mark on Damian's right buttock was a birthmark rather than a bruise. She gave the detective appellant's address.

On May 8, Pintane received a faxed copy of Damian's medical records from Children's Hospital, which stated Damian had been admitted for "bruising, non-accidental trauma, and hematoma." Damian had been treated and released on April 28, 2012, and it was recommended he have follow-up x-rays taken in about two weeks. Pintane spoke with Dr. Crawford-Jakubiak,[1] the Medical Director at Children's Hospital, on May 24. The doctor said Damian had been admitted with "serious injury to his muscles, severe bruising, and injury to his back" and "appeared to be in a great deal of pain." A specialist in the field of child abuse injuries for 17 years, Crawford-Jakubiak said he believed the injuries resulted from being struck multiple times and added that "these were some of the worst he has ever seen." Crawford-Jakubiak had received follow-up x-rays taken at Davis Medical Center which he said revealed six fractured ribs. The probation report related that follow-up x-rays had been required because there was no internal damage or obvious bone fractures, and it was felt it would be easier to detect any possible fractures after the bones began to heal.

---

[1] The probation report first refers to the physician as Dr. Crawford, then later as Dr. Crawford-Jakubiak. For consistency, we use the same surname throughout.

3

On May 21, Pintane and Sergeant McQueary went to appellant's residence and questioned him about the incident.  Appellant said he had finished feeding Damian, stood up to burp him and dropped him from about three feet off the floor.  Damian began crying and appellant " 'panicked and freaked out.' "  He put Damian over his shoulder and tried to comfort him by patting him on the back, and believed everything was alright because he changed Damian's diaper and the baby went to sleep.  Appellant then noticed blood on the shoulder of his shirt where he had been patting Damian.  Appellant eventually told Pintane he had probably caused his son's injuries by patting him too hard.  Appellant was arrested and transported to jail.

Defense counsel referred appellant to Dr. Kevin Kelly for psychological evaluation prior to sentencing.  Kelly administered several tests and reviewed the arrest report and charging documents.  His findings stated:  " 'No diagnosis of acute mental health symptoms; No diagnosis of personality disorder; Consideration of substance abuse (alcohol and marijuana); Stressors include:  Conflicted relationships with the mother of the infant; Marginal ability to sustain stable housing, No employment, No high school diploma, No financial support, Injuries to his infant, Prosecution, Difficulty in social, occupational, or school functioning; Focus of counseling intervention on child abuse perpetration and parenting education.' "  Kelly concluded:  " 'The instant offense appeared to be the result of inexperience as a parent and social immaturity resulting in failure to inform the child's mother and failure to get medical attention for the infant.  The injuries and [appellant's] poor response might have occurred regardless of whether [appellant] was or was not intoxicated. . . .  The prognosis for rehabilitation of [appellant] is good.  He is capable of completion of high school and he is capable of acquiring job skills.  [Appellant] would benefit from counseling to support personal growth and maturity . . . .  [Appellant] should not be entrusted with unsupervised care of an infant until he has undergone personal counseling and parent training for approximately one year or more . . . .  [Appellant] would benefit from alcohol and marijuana outpatient education through sources such as the community college and AA/NA meetings.' "

4

Interviewed by the probation officer on December 3, 2012, appellant related that when he stood to burp Damian after feeding him, the baby wiggled and appellant dropped him on the floor from about three feet up. Appellant panicked when the baby started to cry and tried to comfort him by putting him over his shoulder and patting his back, and he assumed Damian was okay when he stopped crying. He lied to Hulbert when she asked if Damian was alright, then when he found out about the injuries and that Damian had to be in the hospital, appellant was " 'very emotional' " and confessed he had dropped him. Hulbert was angry with appellant because at first the medical staff had been blaming her for Damian's injuries. Appellant denied being under the influence of anything at the time of the incident but admitted having smoked marijuana earlier in the day. He did not believe he had anger issues, "just a problem controlling his impulses." He said he did not hit his son in anger but might have caused the injuries by patting him too hard while trying to comfort him.

Appellant said he was "sorry this happened" and acknowledged guilt for not being truthful with Hulbert sooner; he knew he made a mistake and wanted to make up for it. He said he wanted to become a good father and, if granted probation, was willing to go to parenting classes and counseling. He said if he was sent to prison, "that would only be time out of his son's life."

In her report dated December 18, 2012, the probation officer stated that Hulbert reported Damian was " 'doing great' " and seemed to have recovered completely. Hulbert had been told he would have no permanent injuries and had no follow-up medical appointments planned. Asked about her recommendation for sentencing, she said she was confused because appellant told her one thing and the police told her another, but said she knew appellant better than the officers and believed he did not need punishment and should not go to prison. She believed appellant needed treatment for alcoholism, and stated that she had split up with him because when drunk he got angry and sometimes violent, and in the past had pulled her hair and thrown her into a wall. When not drunk, he was "the sweetest, kindest, most responsible person ever." As a single mother,

5

Hulbert wanted appellant to be placed on probation and wanted him to be able to help her care for Damian. She thought he should have supervised visitation.

In an amended report submitted on February 5, 2014, the probation officer related a more recent conversation with Hulbert, who stated that Damian was " 'doing fine, healthy and happy.' " She had not taken him back to Children's Hospital and the last medical attention to the injuries from this incident was when she took him for follow-up x-rays in May 2012. He had since had several well-baby checkups at a pediatric clinic and the medical staff had not expressed concerns or asked questions about the injuries. Hulbert agreed with her previous recommendation about sentencing " '110 percent' " and believed "the whole thing was 'blown way out of proportion.' "

The probation officer spoke with Dr. Crawford-Jakubiak in January 2013 to ask about the child's current medical condition, but was told that Damian had not returned for a follow-up. Asked whether appellant's explanation of what happened was possible, Dr. Crawford-Jakubiak said that fractured ribs are most commonly caused by someone "squeezing the chest to the point of rib fracture, or punching or kicking," and that " 'nothing characterized as a pat would be consistent with these injuries, they were very unusually serious.' " The doctor stated that the amount of force necessary to fracture a rib was difficult to quantify but would "definitely have come from blunt force or squeezing." He described the injuries as " 'a violent assault' " such that "[i]f a bystander would have witnessed it, he or she would have been very upset and alarmed.' " Dr. Crawford-Jakubiak did not believe Damian's injuries were life-threatening. He said, " 'Luckily the person edited his behavior.' " The probation report stated, "In other words, he stopped what he was doing before the injuries ended the victim's life. Fortunately, the baby's head was not hit. 'There was no immediate threat of death,' but the assailant's 'behavior was very risky.' "

The amended report also added comments from Detectives Pintane and Waidelich that had not been provided by the time the first report was prepared. Waidelich stated, " 'My concern with this case was that [appellant] chose to try and conceal what he did at the risk of the life of his own child.' " He related Dr. Crawford-Jakubiak having told him

6

" 'that for Damian's age group, it was one of the worst cases of physical abuse he had EVER seen.' " Pintane stated, " 'The fact that he caused so much trauma to this infant and refused to take responsibility for it is inexcusable. Additionally, he risked his son's welfare and lied about what had happened solely out of concern for himself, if caught. . . . The physician specializing in child abuse and child abuse injuries told me this was one of the worst cases he had seen in his career. If I remember right [appellant] broke 12 of his infant son's ribs, TWELVE. He could have killed the child and was content in stating he did not know what happened.' " Both officers urged a prison sentence.

The probation report attached a number of letters from appellant's family and friends that appellant had submitted. Appellant's mother, after describing challenges earlier in appellant's life, stated that when she visited in April 2012, she had never seen appellant so happy, and that he was "very attentive with his son and genuinely loved his life with his son and the mother of his son." Appellant's uncle asked for leniency, noting that being a first time father brought new responsibilities appellant was not used to and stating his belief that appellant could be a "loving father as well as a responsible parent." A friend in whose home appellant had lived described him as "responsible, respectful, reliable, helpful and just an all round good guy" and stated that her daughter loved him and he could be a good father if given a chance. Appellant's cousin said he had known appellant to be "a well-mannered and well-behaved individual throughout his life" and had never seen appellant harm any of the 40 to 50 cousins who would play together at annual family reunions while they were growing up. The grandmother of appellant's niece stated that appellant had lived with her when he first moved to California and he had "always been kind, respectful and well mannered," and "trustworthy with my granddaughter and my home."

Appellant had three prior felony convictions from Florida: unarmed burglary of an unoccupied structure or conveyance in 2006, grand theft of a vehicle in 2007, and resisting an officer with violence in 2008. He also had a 2011 misdemeanor conviction from Lake County for resisting a public officer.

7

## I.

Article I, section 17, of the California Constitution provides: "Cruel or unusual punishment may not be inflicted or excessive fines imposed." Appellant contends that his nine-year sentence is unconstitutionally "unusual" within the meaning of this provision because it is greater than the punishment he would have received if he had committed the same act but Damian had died.[2]

Appellant pled guilty to "abusing or damaging the health of a child" in violation of section 273a, subdivision (a). This statute provides: "Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered, shall be punished by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years."

Appellant admitted the special allegation under section 12022.7, subdivision (d): "Any person who personally inflicts great bodily injury on a child under the age of five years in the commission of a felony or attempted felony shall be punished by an

---

[2] We consider this argument despite appellant's failure to raise it in the trial court. Although failure to contemporaneously object has frequently been held to forfeit a claim that a sentence constitutes cruel and unusual punishment (e.g., *People v. Speight* (2014) 227 Cal.App.4th 1229, 1247; *People v. Norman* (2003) 109 Cal.App.4th 221, 229-230), appellant's particular argument is not fact-bound in the way such claims often are. (*Speight*, at p. 1247; *People v. Russell* (2010) 187 Cal.App.4th 981, 993.) Appellant specifically disavows any attempt to make an "as applied" claim of cruel or disproportionate punishment, describing his claim as raising the purely legal issue that "regardless of the particular circumstances," the statutory provisions for greater punishment for violating section 273a where the injury results in great bodily injury than where the injury results in death prescribe unconstitutionally unusual punishment. In any event, we would have to address the merits of appellant's argument in the context of his ineffective assistance of counsel claim.

additional and consecutive term of imprisonment in the state prison for four, five, or six years."

Appellant suggests that if Damian had died, he might have been charged with and convicted of involuntary manslaughter—not murder, because there was no evidence of malice aforethought, and not voluntary manslaughter, because there was no evidence of intent to kill. Involuntary manslaughter carries a sentence of two, three, or four years. (§ 193, subd. (b).) In this event, he reasons, his sentence could not have been enhanced under section 12022.7 because subdivision (g) of that statute provides that it does not apply to murder or manslaughter. His maximum sentence thus would have been four years rather than the 12-year maximum he faced under sections 473a, subdivision (a), and 12022.7, subdivision (d). And if the court did not find aggravating circumstances (as he points out it did not in the present case), his sentence would have been three years.

Alternatively, if Damian had died, appellant suggests he could have been charged, as he was, with violating section 273a, subdivision (a), and an enhancement under section 12022.95: "Any person convicted of a violation of Section 273a, who under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or injury that results in death, or having the care or custody of any child, under circumstances likely to produce great bodily harm or death, willfully causes or permits that child to be injured or harmed, and that injury or harm results in death, shall receive a four-year enhancement for each violation, in addition to the sentence provided for that conviction." His maximum sentence in this case would have been 10 years, or, if the court did not find the offense aggravated, eight years.[3]

---

[3] Appellant offers several reasons why, if Damian had died, it would have been improper for the district attorney to charge a great bodily injury enhancement under section 12022.7. The first is that the Legislature's enactment of section 12022.95 indicates it intended this more specific statute and not section 12022.7 to apply to a conviction of section 273a, subdivision (a), resulting in death. Second, the exception for murder and manslaughter stated in section 12022.7, subdivision (g), implies the Legislature did not intend section 12022.7 to apply where the victim is killed. Third,

9

Appellant reasons that because "usually" a more serious crime carries a more severe punishment, it is unconstitutionally "unusual" to impose a greater sentence for a less serious crime. In *People v. Schueren* (1973) 10 Cal.3d 553 (*Schueren*), the defendant was charged with assault with intent to commit murder but convicted of the lesser included offense of assault with a deadly weapon. (*Id.* at pp. 556, 558.) Under the laws then in effect, the penalty for assault with a deadly weapon was "imprisonment in the state prison for six months to *life* or a county jail term or fine" while the penalty for assault with a deadly weapon with intent to commit murder was "one to *fourteen years* in prison." (*Id.* at pp. 556-557.) As a result of being convicted of the *lesser* offense, the defendant faced a maximum term of life imprisonment rather than the maximum 14 years he would have faced if convicted as charged.

*Schueren* explained that while earlier caselaw[4] had held a punishment could be deemed unconstitutionally "unusual" only by means of a " 'disproportionate' test," the California Supreme Court had subsequently adopted another method, giving "a literal interpretation to the word 'unusual.' " (*Schueren*, *supra*, 10 Cal.3d at pp. 559-560, discussing *People v. Anderson* (1972) 6 Cal.3d 628, 654.) *Schueren* concluded: "Here had defendant pleaded guilty to the offense charged or been found guilty of that offense his prison term could not have exceeded 14 years but by asserting his constitutional rights against self-incrimination and to a jury trial and by successfully defending against the crime charged but not against an included offense, he is now faced with the possibility of life in prison. Under the circumstances we believe that a prison term exceeding 14 years is, literally, an 'unusual' punishment—i.e., a punishment that in the ordinary course of

section 12022.7 refers to "great bodily injury" without reference to "death," and the Legislature has indicated that "great bodily injury" does not *include* death in the many statutes that expressly define offenses or enhancements with reference to both great bodily injury and death (e.g., § 273a, subd. (a) [child abuse under circumstances "likely to produce great bodily harm or death"]; § 422 [threat to commit crime "which will result in death or great bodily injury"]; § 12022.5, subd. (d) [use of firearm with "intent to inflict great bodily injury or death"]; § 12022.53, subd. (d) [discharge of firearm causing "great bodily injury . . . or death"].)

[4] *In re Finley* (1905) 1 Cal.App. 198, 201-202.

10

events is not inflicted. It would seem indisputable that an accused is normally not subject to an increased maximum prison term as a consequence of, inter alia, exercising his constitutional rights *and* successfully defending against the crime charged. In our opinion such a term under the circumstances is contrary to 'the requirements of regularity and fairness' embodied in article I, [former] section 6 [now section 17] (see *Furman* v. *Georgia*, 408 U.S. 238, 276-277 [conc. opn. by Brennan, J.])." (*Schueren*, at pp. 560-561, fn. omitted.)

Contrary to appellant's argument, the present case is not like *Schuerer*. Appellant "has not been prejudiced by asserting his constitutional rights to self-incrimination and trial by jury; did not successfully defend against the charged crime; and, upon judgment, he did not suffer a greater sentence for a lesser included offense." (*People v. Macias* (1982) 137 Cal.App.3d 465, 476-477 [distinguishing *Schuerer* in rejecting claim that sentence for attempted second degree murder was cruel and unusual because it was identical to sentence for attempted first degree murder].)

"[I]n our tripartite system of government it is the function of the legislative branch to define crimes and prescribe punishments" and "such questions are in the first instance for the judgment of the Legislature alone." (*In re Lynch* (1972) 8 Cal.3d 410, 414.) Although " 'the final judgment as to whether the punishment it decrees exceeds constitutional limits is a judicial function,' " the Legislature is " 'accorded the broadest discretion possible in enacting penal statutes and in specifying punishment for crime' " (*ibid.*, quoting *People v. Anderson*, *supra*, 6 Cal.3d at p. 640) and " ' "[s]tatutes must be upheld unless their unconstitutionality clearly, positively and unmistakable appears." ' " (*Lynch*, at p. 415, quoting *In re Dennis M.* (1969) 70 Cal.2d 444, 453.)

Here, appellant's sentence was a function of the prosecutor's charging discretion and the court's discretion in sentencing. He points to scenarios under which his sentence would exceed what it might have been if Damian had died. But he ignores the obvious possibility that his sentence could have been far greater in that tragic event. As respondent points out, if the child had died and appellant had been charged and convicted under section 273ab, his sentence would have been 25 years to life. Section 273ab,

11

subdivision (a), provides: "Any person, having the care or custody of a child who is under eight years of age, who assaults the child by means of force that to a reasonable person would be likely to produce great bodily injury, resulting in the child's death, shall be punished by imprisonment in the state prison for 25 years to life." Appellant's reply brief does not respond to this point.

Appellant further bases his claim of unconstitutionally "unusual" punishment on the fact that the great bodily injury enhancement made his section 273a conviction a "violent felony" under section 667.5, subdivision (c)(8). As a result, appellant is precluded from accruing more than 15 percent of worktime credit. (§ 2933.1, subd. (a).) Appellant argues that he will be required to serve seven and two-thirds years of his nine-year sentence, whereas if Damian had died and appellant had been convicted under section 273a with an enhancement under section 12022.95, his maximum 10-year sentence could have been reduced by half with worktime credit to only five years (or a middle term eight-year sentence reduced to four years). Again, this argument ignores the fact that if Damian had died appellant could have been charged under section 273ab, which carries a minimum 25 year and potential life term sentence.

In short, the fundamental premise of appellant's argument—that his sentence is unconstitutionally "unusual" because it is longer than what he would have received if Damian had died—is faulty. His sentence may be longer than one which *might* have resulted from a prosecution based on the child's death but it is far shorter than another that appears at least equally likely to have resulted.

## II.

Appellant next challenges the trial court's reasons for imposing middle terms on the offense and the enhancement. Under section 1170, subdivision (b), "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court. . . . In determining the appropriate term, the court may consider the record in the case, the probation officer's report, other reports, including reports received pursuant to Section 1203.03, and statements in aggravation or mitigation submitted by the prosecution, the

12

defendant, or the victim, or the family of the victim if the victim is deceased, and any further evidence introduced at the sentencing hearing. The court shall select the term which, in the court's discretion, best serves the interests of justice. The court shall set forth on the record the reasons for imposing the term selected and the court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law." "The court shall state the reasons for its sentence choice on the record at the time of sentencing." (§ 1170, subd. (c).) The sentencing judge may consider any factor "reasonably related to the sentencing decision." (Cal. Rules of Court, rule 4.420(b); rule 4.408(a) [enumeration of criteria for discretionary sentencing decisions does not preclude application of additional criteria "reasonably related" to decision].) The trial court's decision is subject to review for abuse of discretion. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.)

Appellant views the court as having chosen the middle term rather than a lower term sentence on the offense because the first probation report "did not inform her of the nature of the injuries" and the second report "informed her that they were 'far more grave than they originally appeared . . . in the first probation report.' " This reason was unsupported, he argues, because the second report did not contain any information showing the injuries were more grave than originally reported. Appellant sees the court as having imposed the middle term on the enhancement because it was concerned about the credibility of Hulbert's report that Damian was doing well and argues that the court irrationally declined to impose a mitigated term based on the lack of corroborating evidence. Instead, appellant urges, if the court felt current information from a medical professional was necessary, it should have required probation to obtain such information from medical staff at the clinic where the child was seen for check-ups.

A review of the transcript of the sentencing hearing shows that the court did not base its decisions on any one factor but on a considered weighing of a number of factors relevant to the case. At the outset of the hearing, the court stated that it was not going to grant probation, as appellant was presumptively ineligible for probation due to his prior felony convictions (§ 1203, subd. (e)(4)) and there were no unusual circumstances to

13

overcome the presumption,[5] but that it was not convinced it was an aggravated case as the probation department urged. The court noted that appellant was entitled to recognition of the mitigating factor that appellant gave an early plea, a point not mentioned in the probation report, questioned the applicability of one of the aggravating circumstances the probation report had listed—that "the defendant engaged in violent conduct that may indicate a serious danger to society"—and noted that appellant "may or may not have been on probation." The court then listed the aggravating factors that did apply: the victim was particularly vulnerable; appellant had numerous prior convictions (all "theft-related . . . and/or driving, driver's license-related") and his prior performance on probation had been unsatisfactory. The court pointed out that "the victim is someone who can't talk" and stated that it believed appellant had not been honest throughout the investigation "right up until today." The court stated it was "not happy about imposing this sentence" but "there's an infant who has been severely assaulted, violently assaulted if you believe the doctor at Children's Hospital in Oakland, and I do believe him. He's got no motive or reason to mischaracterize or add hyperbolae to the dialogue. [¶] And to break or fracture six ribs, either by a hand to the back or squeezing or something else in my view earns you a prison sentence. And I don't think it is an aggravated case and I don't think it's a mitigated case either, so I am inclined to impose the midterm." Regarding the enhancement, the court noted that it could not "double up" on the conduct

---

5 The defense had argued for probation, urging that the case was "unusual" in that the incident was the result of the "immature and inappropriate response of a new and untrained father" who panicked in a stressful situation, not a deliberate act of violence, as well as that appellant was "youthful" and had no recent record of violence. As factors supporting probation, the defense asked the court to consider the incident an unusual circumstance, unlikely to recur, noting Dr. Kelly's statement that appellant's prognosis for rehabilitation was good and that there was good reason to believe he would cooperate with probation, and urging that appellant's felonies were five years prior, when he was 18 to 19 years old, that his incarceration would have a detrimental effect on his child and Hulbert, and that probation's assessment and the letters from appellant's family and friends indicated it was unlikely he would be a danger to society.

14

that constituted the offense and that the probation officer "misapplied the enhancement in recommending the aggravated sentence or aggravated term."

There is no merit to appellant's claim that the only reason the court did not impose a lower term was a mistaken view that the amended probation report demonstrated the injuries were more severe than first reported. True, the second report did not indicate a difference in the specific injuries—"serious injury to his muscles, severe bruising and injury to his back" and six fractured ribs. But it did provide more detail, in particular with regard to the doctor's opinion as to how the injuries were inflicted. The first report related the doctor's view that the injuries were the result of "being struck with a blunt object, namely a hand, and the baby had been struck multiple times," and that "these were some of the worst he has ever seen." The second report added the doctor's response to the question whether appellant's explanation of the incident was possible. The response both underscored the severity of the injuries and indicated appellant was not being truthful: The doctor stated that fractured ribs are most commonly causes by "squeezing the chest to the point of rib fracture" or punching or kicking, that " 'nothing characterized as a pat would be consistent with these injuries, they were very unusually serious' " and that the injuries reflected " 'a violent assault.' " In light of this report, the court's statement that "[t]he nature of the injuries are far more grave than they originally appeared to me in the first probation report" is entirely unsurprising. The court noted at the hearing that it had wanted the second report because it felt "not fully informed as to the nature of the injuries, what the medical professionals assessed the injuries to be and what the medical professionals were going to opine as to the cause of the injuries" because appellant's explanation of the events was so different from the prosecution's. The information contained in the second probation report amply supported the court's conclusion that the injuries Damian suffered were so severe that a mitigated term was not justified.[6]

---

[6] In addition to the new conversation with Dr. Crawford-Jakubiak, as described above, the second probation report added comments from Detectives Pintane and Waidelich, which stated in strong terms their concern about the severity of Damian's

15

Appellant argues that he claimed Damian's injuries were caused by his accidentally dropping the baby, not by his "patting," and the probation report suggests the doctor was not properly informed of appellant's explanation or asked whether the injuries were consistent with a fall. This challenge to the significance of the doctor's opinion is not persuasive. The statement in appellant's brief that he "did not claim that patting the child caused the injuries" is directly contrary to his statement to the probation officer as related in the probation report: "The defendant claimed he did not hit his son in anger, but did possibly pat him too hard while trying to comfort him, and in doing so, caused his injuries." Similarly, the probation report states that appellant "eventually told Detective Pintane he had probably patted his son too hard and that is what caused his injuries." Additionally, the probation officer's evaluation states that the doctor who examined Damian at the hospital "stated the injuries were not caused by a fall, but were the result of being struck multiple times with a blunt object, namely, a person's hand."

The court's final explanatory statement makes clear that it considered the arguments for imposing either an aggravated term, as the probation department recommended, or a mitigated term, as the defense requested, and concluded neither was appropriate. The court stated: "I don't find the aggravated terms identified by probation is convincing that this meets the objective of sentencing. I do have the defendant's age in mind. I don't think this is a mitigated term because I think this was a violent assault on an infant and to which the injuries cannot be explained by anything other than intentional conduct of a very violent nature and the mitigated term is definitely not appropriate." The court's reasons for imposing the middle term are amply supported by the record.

Appellant's argument concerning the sentence choice on the enhancement is also unavailing. Focusing on the court's request for additional information about the current condition of the child, appellant argues that the court declined to impose a mitigated term because it did not believe Hulbert's reports that the child was fine. This reason,

---

injuries and appellant's attempt to conceal what happened despite the risk to the child. The court did not mention these comments.

according to appellant, was irrational because it treated the lack of what the court deemed credible evidence that Damian was doing well as evidence that he was *not* doing well.

At the hearing on January 11, 2013, the court declared that the probation officer's report was "inadequate . . . [¶] . . . by the standards that I expect in a case like this, especially given the amount of potential time that's to be imposed. . . . [¶] . . . [¶] In particular, I am going to send it back. And I want the report to incorporate the findings or observations of Dr. Kelly. In particular, also, I want to see more reliable information about the—what's the current condition of this child."

With respect to Damian's current condition, the first probation report related Hulbert's statements that the child was " 'doing great' and seem[ed] to have recovered completely" and that she had been told he would have "no permanent damage." The second report stated that Dr. Crawford-Jakubiak had been unable to provide information on Damian's current condition because the child had not returned for any follow-up care. Hulbert, asked again about Damian's progress, told the probation officer that he was " '. . . doing fine, healthy and happy' " and that the medical staff who had seen him for well-baby check-ups had not expressed concerns or asked questions about his previous injuries.

As we have said, the probation department in its amended report altered its position, recommending imposition of the aggravated term on both the offense and the enhancement rather than the middle terms it originally recommended; the defense requested mitigated terms. At the beginning of the hearing, the court stated it was inclined to impose the middle term on the offense and either the middle or mitigated term on the enhancement. The prosecutor, emphasizing the amount of force necessary to break the baby's ribs and appellant's attempt to evade responsibility, requested an aggravated term on the offense and a mitigated term on the enhancement. The probation officer argued for "at least" the middle term on the enhancement because six fractured ribs, while possibly not rising to the level of "aggravated" because there was no permanent disfigurement and the child would recover, was "serious injury" justifying a middle term "for the amount of pain and suffering" caused.

17

These last comments were apparently persuasive to the court, which explained its sentence on the enhancement as follows: "I think [the probation officer's] observations actually are pretty relevant. This is not an aggravated term, I have made that clear; however, this isn't an instant [*sic*] where there is just bruising. At least six ribs were fractured and the information that we have from the mother is that the child is doing well medically. It's not been confirmed by any medical professional. While I am not overly suspicious of her representation, I am concerned about her ability to report objectively. So I think the middle term of five years is appropriate for a total confinement time of nine years."

Appellant likens this case to *United States v. Weston* (9th Cir. 1971) 448 F.2d 626 (*Weston*). There, after the defendant was found guilty of a drug offense, the trial court indicated its view that the minimum sentence of five years would be appropriate. (*Id.* at p. 628.) The court then received a presentence report stating that federal narcotics agents had advised that the defendant was the chief supplier of heroin to the area, having travelled to Mexico or Arizona as often as every two weeks to obtain $60,000 worth of heroin which she distributed to dealers, earning approximately $140,000. (*Ibid.*) The defendant denied the allegations. (*Id.* at pp. 629-630.) Based upon the report, the court imposed the maximum sentence of 20 years. (*Id.* at p. 630.) Vacating the sentence, the reviewing court stated: "In essence, then, what we have is a conviction at a trial providing all of the safeguards required by the Constitution, of an offense warranting, in the opinion of the trial judge, the minimum sentence of five years. This is followed by a determination, based on unsworn evidence detailing otherwise unverified statements of a faceless informer that would not even support a search warrant or an arrest, and without any of the constitutional safeguards, that Weston is probably guilty of additional and far more serious crimes, for which she is then given an additional sentence of fifteen years. [Citations.] To us, there is something radically wrong with a system of justice that can produce such a result. . . ." "In *Townsend v. Burke* [(1948) 334 U.S. 736], the Supreme Court made it clear that a sentence cannot be predicated on false information. We extend it but little in holding that a sentence cannot be predicated on information of so little

18

value as that here involved. A rational penal system must have some concern for the probable accuracy of the informational inputs in the sentencing process." (*Weston*, at pp. 630-631, 634.)

Appellant characterizes the present case as the "mirror image" of *Weston*, arguing that just as the court in *Weston* could not assume the truth of information damaging to the defendant that the defendant disputed and the evidence did not support, the trial court in the present case could not assume the falsity of information favorable to appellant in the absence of evidence contradicting it.

We do not view the court's comments as indicating it would have imposed a mitigated term but for its conclusion, based on its distrust of Hulbert's report, that Damian was *not* doing well medically, or even that it in fact concluded Damian was not doing well. We read the remarks as a partial explanation why the court felt a mitigated term was not appropriate in light of the seriousness of the injuries. The court had previously expressed its concern about Hulbert's objectivity, noting her support of appellant despite his not being forthcoming with her about the incident, and, particularly, her comment to the probation officer that "this whole thing has been blown out of proportion." This, the court felt, suggested Hulbert was "somebody not really looking out for their kid, that's somebody looking at something else." In our view, the court was not saying it was rejecting the mitigated term because it believed Damian was still suffering from his injuries but rather that it was not prepared to rely upon Hulbert's report that the child was fully recovered as the basis for imposing a mitigated term despite the seriousness of the injuries inflicted.

Appellant urges that the court should have requested additional information if it did not believe Hulbert, stressing that the court's need for information about Damian's current condition was the reason it sent the case back for a new probation report after the January hearing. But this does not mean that evidence from a medical professional that the child had recovered would have persuaded the court to impose a mitigated term on the enhancement. In January, when the court asked for more reliable information about the current condition of the child, it explained, "I have been left with a certain impression

19

that I am—I believe I may be wrong about. So instead of leaving me with an impression, I want to know what the facts are." At the February 5 hearing, the court remarked that it had requested the second report because the first one left it feeling "not fully informed as to the nature of the injuries, what the medical professionals assessed the injuries to be and what the medical professionals were going to opine as to the cause of the injuries," and that it now believed the injuries were "far more grave than they originally appeared to me in the first probation report." It is obvious that, after the first report, the court felt current information was critical to confirm or refute its impression that the injuries were less significant. But after the second report, the court's view of the nature of the injuries was different. Given the additional information about the injuries and, particularly, how they were caused, it is reasonable to infer that information about the child's current condition became much less important.

In sum, the court reached a thoughtful and balanced decision on sentencing. The court expressly considered mitigating factors, including appellant's age and Dr. Kelly's view that the incident was the result of his inexperience and immaturity, but found them outweighed by the severity of the injuries, which indicated a violent assault, and appellant's attempt to evade responsibility rather than seek immediate medical attention for his child.[7] We find no abuse of discretion.

### III.

Appellant's final contention is that he was denied his constitutional right to effective assistance of counsel by his attorney's failure to object to the sentence imposed as constitutionally "unusual" and to the court's reasons for imposing middle terms as unsupported by the record and irrational. He further urges that a reasonably competent attorney would have asked the court to dismiss the enhancement in the interests of justice pursuant to section 1385 in order to avoid double punishment.

---

[7] The court expressly acknowledged its respect for Dr. Kelly and the weight it gave his opinion, but stated that it thought he "reached his conclusion without giving the proper weight to the nature of the injuries."

20

" ' " 'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " ' [Citation.]" (*People v. Vines* (2011) 51 Cal.4th 830, 875-876, quoting *People v. Lucas* (1995) 12 Cal.4th 415, 436.)

We have already concluded that appellant's challenges to his sentence based on the prohibition against "unusual" punishment and the court's reasons for imposing the middle term are unavailing. The only question remaining, therefore, is whether defense counsel's representation was constitutionally deficient based on his failure to ask the court to strike the great bodily injury enhancement. "Although section 1385 provides that a dismissal 'in furtherance of justice' may be ordered either on the motion of the district attorney, or on the court's motion, a defendant may invite the court to exercise its power by an application to strike a count or allegation of an accusatory pleading, and the court must consider evidence offered by the defendant in support of his assertion that the dismissal would be in furtherance of justice." (*Rockwell v. Superior Court* (1976) 18 Cal.3d 420, 441-442.)

Appellant's argument that a competent attorney would have asked the court to strike the enhancement is based on his view that using the nature of the injuries both to establish the "great bodily injury" enhancement and to impose a higher sentence on the offense than would otherwise be imposed entailed "an element of double punishment."[8]

_____

[8] Appellant stops short of an actual double punishment argument. In the context of his cruel and unusual punishment argument, he stated that he "is not making a 'double punishment' argument, but the fact remains that he is being punished by an enhancement, based on the same fact on which his conviction and punishment for the underlying offense are based."

21

Appellant urges that the injury "probably" would not have warranted a conviction under section 273a or a prison term for that offense if it had not been a "possibly great bodily injury,"[9] so imposing middle terms for both the offense and the enhancement based on the nature of the injuries "was arguably excessive punishment." But a violation of section 273a is not based on the severity of the injury; indeed, it may apply in the absence of any physical injury, if the child is subjected to "unjustifiable . . . mental suffering" or the child's "health is endangered." The focus of the statute is on the conduct of the defendant and circumstances involved. A felony offense under section 273a, subdivision (a), is committed by a person who "*under circumstances or conditions likely to produce great bodily harm or death*, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered . . . ." (Italics added.) The offense is a misdemeanor if committed "under circumstances or conditions other than those likely to produce great bodily harm or death." (§ 273a, subd. (b).) And, as we have explained, the court's decision to impose middle terms on the offense and on the enhancement were not based solely on the aggravated nature of the injuries.

Putting aside the question whether a reasonably competent attorney would have asked the court to strike the enhancement, we are not convinced there is a reasonable probability appellant would have obtained a more favorable result if defense counsel had done so. Appellant argues it is reasonably probable the court would have stricken the great bodily injury enhancement if defense counsel had raised the matter because the court's remarks at sentencing demonstrated it recognized the "double-punishment

---

[9] Although he admitted the great bodily injury enhancement, appellant argues on appeal that the rib fractures "may or may not have constituted 'great bodily injury,' " as reflected in the facts that they did not appear on the first set of x-rays but only on the second and that Hulbert reported Damian having completely recovered and the doctors having said he would have no permanent damage.

problem," the court stated it was "not happy about imposing this sentence," the child's injuries were not severe and, if the defense had offered evidence that Damian had completely recovered, the court would have given appropriate weight to Hulbert's report of his condition and viewed the injuries as "not great."

The court's comments regarding double punishment were part of its explanation why it disagreed with probation's recommendation of an aggravated term on the enhancement. After describing Damian as having been "severely assaulted, violently assaulted," and declaring that the section 273a offense was neither aggravated nor mitigated, the court explained why the enhancement did not warrant an aggravated term: "You have to take the conduct into account of the principal count to which he has been convicted and that is basically felony child abuse. So you don't get to double it up on the enhancement. And the interpretation of what term to recommend on enhancement is based on severity, permanency and nature of the injury."

The court's view that imposing an *aggravated* term on the enhancement in addition to the punishment for felony child abuse would amount to "doubling up on the enhancement" does not suggest it would have been receptive to an invitation to dismiss the enhancement altogether. First, the court's observation was consistent with section 1170, subdivision (b), which provides that the court "may not impose an *upper* term by using the fact of any enhancement upon which sentence is imposed under any provision of law." (Italics added.) Second, the court declined to impose a mitigated term on the enhancement because of the severity of the injuries. Appellant's statement that the injuries were not severe utterly ignores Dr. Crawford-Jakubiak's statements that they were "some of the worst he ha[d] ever seen," "very unusually serious" and the result of " 'a violent assault.' " The court repeatedly expressed its view that the injuries were extremely serious.

The court's comment that it was not happy about the sentence it was imposing does not alter this assessment. As we have said, the court took a balanced approach to this case; it expressly considered the mitigating evidence of appellant's age and Dr. Kelly's view that the incident was the result of appellant's inexperience and immaturity,

as well as appellant having entered an early plea. The court made clear that it believed the probation officer had overstated the negative, specifically in failing to mention appellant's plea and in applying the aggravating factor that "[t]he defendant has engaged in violent conduct that may indicate a serious danger to society." (Rule 4.421(b)(1).) "Nevertheless," the court stated, "I have to look at the overall result." At this point, after remarking on the victim's infancy and appellant's dishonesty about the incident, the court stated, "And that doesn't mean that I happily impose this sentence. In fact, I am not happy about imposing this sentence. But there's an infant who has been severely assaulted, violently assaulted . . . ." In context, it is apparent that the court was remarking on the sadness of the case in its entirety, the fact that it called for so significant a punishment, not expressing unhappiness about being required to impose a harsher sentence than it felt appropriate.

Nor is it reasonably probable appellant would have obtained a more favorable result if defense counsel had offered evidence to corroborate Hulbert's report that Damian was doing well medically. As we have said, while the court expressed skepticism about Hulbert's objectivity, there is no indication it based its sentencing decision on a conclusion that Damian had *not* recovered from his injuries. We recognize that the court considered, and even expressed inclination toward, imposing a mitigated term on the enhancement. Indeed, the court expressed this inclination immediately after its initial comments questioning Hulbert's view of the case. But it then concluded the middle term was appropriate after further argument from the defense (stressing the absence of maliciousness in appellant's conduct), the prosecutor (emphasizing appellant's attempts to evade responsibility and Hulbert's statement that she and appellant were not together because of his becoming violent when drunk, yet requesting the mitigated term on the enhancement), and the probation officer (emphasizing the amount of pain and suffering Damian was caused). Given the court's focus on the aggravated nature of Damian's injuries, we see no reasonable probability that evidence Damian was currently doing well would have persuaded the court even to impose a mitigated term, much less to strike the great bodily injury enhancement.

24

## DISPOSITION

The judgment is affirmed.

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Stewart, J.